[No. 12342-8-II.    Division Two.    February 20, 1992.]

The State of Washington, *Respondent*, v. Daniel Joseph Yates, *Appellant*.

*Constance O. Bartholomew* and *Sexton, Bartholomew & Johnsen,* for appellant (appointed counsel for appeal).

*C. Danny Clem, Prosecuting Attorney,* and *Irene K. Asai* and *Pamela B. Loginsky, Deputies,* for respondent.

MORGAN, A.C.J. — Daniel Joseph Yates appeals from his conviction of aggravated murder in the first degree in the death of Bunnie Brown.[1] We affirm.

On September 17, 1987, Yates picked up three teenagers: Bunnie Brown, age 13, Lisa Gardner, age 14, and Cloise Orand, age 13. He offered them $15 each to move furniture.

---

[1]Yates does not appeal from his convictions of three counts of rape in the first degree and two counts of attempted murder in the first degree.

They accepted and got into his van. After purchasing some beer, Yates drove to his tattoo shop, where he and Orand moved some items inside. Yates took two flasks of liquor from the shop and drove with the teenagers to a rural location.

After Yates and the teenagers drank the alcohol, Brown discovered a gun in Yates's jacket pocket. Yates took the gun from her, ordered all three teenagers to disrobe, and ordered them to have sex with each other and him. Afterwards, he took them out of the van, tied them up and left for a short time. When he returned, he discovered that Orand had freed himself. He then proceeded to strangle, stab and shoot all three.

After feigning death and waiting for Yates to leave, Gardner reached a road and summoned help. She and Orand survived, but they were severely injured.

Brown was unconscious and unresponsive when she arrived at the hospital. The hospital made aggressive attempts to save her life. Ultimately, however, she was diagnosed as being in a permanent vegetative state due to a gunshot wound in the back of her skull. On October 1, after discussion between the hospital, the treating physicians and her family, her respirator was removed. On November 5, her feeding tube was removed, and on November 11 she died.

On September 23, 1987, Yates was charged with crimes against Gardner and Orand. However, he was not charged with a crime related to Brown because it was not known whether she would live or die.

On the same date, September 23, Yates brought a motion to prohibit the removal of the life support to which Brown had been connected. Brown's family and the State opposed the motion. The court concluded that it did not have jurisdiction over the decision to remove life support, and that Yates did not have standing to intervene in the decision.

On the same date, Yates brought a motion to prevent the destruction of evidence that might be obtained from Brown while still alive. That motion was also denied.

After Brown died, Yates was charged with aggravated murder in the first degree, and the State filed a notice of intent to seek the death penalty. When Yates moved to change venue from Kitsap County, the motion was granted and venue changed to Pierce County. Yates was given access to information pertaining to the 72 hours preceding Brown's death, through both medical records and her physicians.

After a number of continuances, a jury trial commenced in Pierce County. After voir dire, Yates made a second motion for change of venue. That motion was denied.

The jury convicted Yates on all charges, but it was not able to agree unanimously upon the death penalty. Accordingly, Yates was sentenced to life imprisonment without the possibility of parole.

## REMOVAL OF LIFE SUPPORT

### A

Yates first assigns error[2] to the court's conclusion that it did not have jurisdiction to intervene in the decision on whether to remove Brown's life support devices. He also assigns error to the court's conclusion that he lacked standing to intervene in that decision.

Yates relies on *In re Hamlin*, 102 Wn.2d 810, 821-22, 689 P.2d 1372 (1984), in which the court stated that it was necessary, when deciding whether to remove life support, "to safeguard the rights and liabilities of the many persons and institutions involved". He contends that he fell within the class of "the many persons and institutions involved" because he could have been subjected to a charge of aggravated murder, with a possible death sentence, upon life support being removed.

---

[2]Yates begins the argument section of his brief with a lengthy discussion of the public policy considerations regarding the "right to die". He also contrasts the ramifications of the "quality of life" ethic with the "natural rights" ethic. While interesting, the discussion does not directly relate to any of the decisions made by the court below and will not be addressed here. To the extent the discussion applies to specific assignments of error, it will be considered in that context.

After *Hamlin*, the Supreme Court refined the criteria for removing or withholding life support. In *In re Grant*, 109 Wn.2d 545, 556, 747 P.2d 445, 757 P.2d 534 (1987), it said:

> We hold, therefore, that in the absence of countervailing state interests, a person has the right to have life sustaining treatment withheld where he or she (1) is in an advanced stage of a terminal and incurable illness, and (2) is suffering severe and permanent mental and physical deterioration. We have previously indicated four state interests which might militate against allowing the exercise of this right in any particular case. Those interests are: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. *In re Colyer*, 99 Wn.2d 114, 122, 660 P.2d 738 (1983).

Regarding judicial involvement in the decision to remove or withhold life support from an incompetent patient, the court said in 109 Wn.2d at 566-67:

> We hold that prior court authorization to withhold life sustaining treatment shall not be required where all the following circumstances are present:
> 1. The incompetent patient's attending physician, together with two other physicians qualified to assess the patient's condition, determine with reasonable medical judgment that the patient is in an advanced stage of a terminal and incurable illness and is suffering severe and permanent mental and physical deterioration;
> 2. The incompetent patient's legal guardian, if one has been appointed, determines that either (a) the patient, if competent, would choose to refuse life sustaining treatment; or, (b) if such a determination cannot be made, the guardian determines that the withholding of life sustaining treatment would be in the best interests of the patient;
> 3. No members of the incompetent patient's immediate family object to the decision to withhold such treatment; and
> 4. Neither the patient's physicians nor the health care facility responsible for the care of the patient object to the decision to withhold such treatment.

(Footnotes omitted.)

■■ Applying *Grant*'s criteria for removing or withholding life support, we hold that none of the four state interests militating against allowing removal of life support is present in this case. Brown remained in a permanent vegetative state after vigorous efforts had been made to

save her life. There is no issue regarding suicide or the integrity of the medical profession. And Yates can hardly be considered an innocent third party.

Applying *Grant*'s criteria for judicial involvement in the decision to remove or withhold life support, we hold that Yates does not fall within the groups who may object to the decision to remove life support from an incompetent patient. Only the patient's immediate family members, physicians, and medical care facility are allowed to object, and Yates is none of these.

In sum, Yates is a legal stranger to the decision of whether Brown's life support should have been removed. After confessing to the acts that caused her to require life support devices, he then sought to minimize his own jeopardy by keeping her on life support. To sanction his efforts would be unconscionable, for "[t]he defendant's desire to mitigate his liability may never legally override, in whole or in part, the decisions of the physicians and the family regarding the treatment of the victim." *People v. Gulliford*, 86 Ill. App. 3d 237, 242, 407 N.E.2d 1094, 1098 (1980) (quoting *In re J.N.*, 406 A.2d 1275, 1282 (D.C. 1979)). The trial court did not err when it ruled that it lacked jurisdiction, and that Yates lacked standing, to intervene in the decision to remove Brown's life support.

## B

Yates also sought to influence the decision on whether to remove Brown's life support by requesting an order prohibiting the destruction of potentially exculpatory evidence. He asserted that the only way to prevent that destruction was to keep Brown on life support.

██ There is no authority for applying the rules regarding the preservation of potentially exculpatory physical evidence to a living human being, and we decline to do so. Moreover, the cases upon which Yates relies, *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976) and *State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983) were overruled in *State v. Straka*, 116 Wn.2d 859, 810 P.2d 888 (1991). Under *Straka*,

" 'unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process". *State v. Straka*, 116 Wn.2d at 884 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988)). Yates has made no such showing of bad faith, and the court did not err in denying his motion to preserve evidence.

### PROPOSED JURY INSTRUCTIONS

Yates contends that certain instructions were necessary to his defense of intervening cause, a defense grounded on the factual assertion that Brown's death was caused not by his acts but by the removal of her life support. He asserts that the proposed instructions reflect public policy regarding the "maintenance of basic human necessities".

### A

Yates argues that the court erred by not instructing the jury:

> In determining whether or not Bunnie Brown died as a result of the defendant's acts, the State has the burden of proving beyond a reasonable doubt that the removal of food and water was not a new independent cause of death.

■ We disagree. When life support is removed, the cause of death is not the removal, but whatever agency generated the need for the life support in the first instance. *In re Grant*, 109 Wn.2d at 564. Here, then, the removal of food and water could not have been a legally cognizable cause of death, and the court properly refused the proposed instruction.

■ Additionally, no instruction need be given unless it is supported by sufficient evidence, and it is supported by sufficient evidence only when the jury could reasonably infer the existence of the facts needed to use it. *See State v. Fowler*, 114 Wn.2d 59, 67, 785 P.2d 808 (1990) (lesser included offense instruction required only when evidence sufficient to support inference that lesser included offense was committed), *disapproved on other grounds in State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991); *State v. Birdwell*,

6 Wn. App. 284, 297, 492 P.2d 249, *review denied*, 80 Wn.2d 1009, *cert. denied*, 409 U.S. 973 (1972); 14 L. Orland & K. Tegland, Wash. Prac. § 249 (4th ed. 1986). In this case, even if removal of life support could sometimes be a legally cognizable cause of death, there is no possible inference that either the inception or removal of life support was independent of whatever criminal agency caused Brown's condition. Rather, the *only* reasonable inference was that the life support was *not* independent of the criminal agency. It follows that the evidence did not support the instruction, and that the trial court was not obliged to give it.

In ruling that the trial court was not required to instruct on intervening cause where none could exist and/or none was shown by the evidence, we do not mean to imply that the State was not obliged to prove proximate cause. On the contrary, the trial court properly instructed on proximate cause, and those instructions gave Yates a proper basis from which to argue his case to the jury.[3] *State v. Little*, 57 Wn.2d 516, 521-22, 358 P.2d 120 (1961).

### B

Yates also argues that the court should have instructed the jury:

> In determining whether or not Bunnie Brown died as a result of the defendant's acts the State has the burden of proving beyond a reasonable doubt that Bunnie Brown would have died within three years and a day of defendant's acts had she continued to be given food and water.

The usefulness of this instruction, if any, rests on the premise that Yates had the right to have Brown maintained on nutritional life support. As we have already discussed, he did not. Absent that right, the instruction simply presents an irrelevant hypothetical circumstance. What is relevant is (1) Brown's death on November 11, 1987, and (2) the cause of that death; what might have happened 3 years hence is of no consequence.

---

[3] Yates asserts that it was error to instruct on proximate cause but he does not say why. We perceive no error.

## C

Yates assigns error to the court's refusal to give his proposed instruction on the definition of death. In order for the jury to need an instruction defining death, there would have had to have been evidence tending to show that Brown was still alive under whatever standards the definition contained. In fact, it was undisputed that she died on November 11, 1987, regardless of how death be defined. Although Yates asserts that the instruction was material to his defense, he has not shown in any way why that is true, and the trial court properly refused it.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ALEXANDER, J., and WORSWICK, J. Pro Tem., concur.

Reconsideration denied April 7, 1992.

Review denied at 119 Wn.2d 1017 (1992).