[No. A057774. First Dist., Div. Three. Mar. 31, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICIO ERNESTO FUNES, Defendant and Appellant.

COUNSEL

Jo Anne Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Tyler R. Meade, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WHITE, P. J.—A jury convicted defendant Mauricio Ernesto Funes[1] of one count of second degree murder (Pen. Code, § 187)[2] and one count of participating in a criminal street gang (§ 186.22, subd. (a)). With respect to the murder count, the jury further found that defendant had used a dangerous and deadly weapon (a baseball bat) (§ 12022, subd. (b)), and had committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). The court sentenced defendant to a term of 16 years to life, with the possibility of parole.

On appeal, defendant contends we must reverse his murder conviction because: (1) The trial court erroneously admitted evidence of numerous incidents of gang affiliation; (2) the trial court abused its discretion when it refused to allow the defense to reopen its case to present evidence that defendant was right-handed; and (3) the trial court erroneously refused special instructions on the proximate cause of death. In addition, defendant contends we must reverse the gang participation count and gang affiliation enhancement because the trial court failed to instruct the jury that it must unanimously agree on the two or more predicate offenses which constitute the "pattern of criminal gang activity" required for a conviction or enhancement under section 186.22. We affirm.

FACTS

In the early morning hours of June 9, 1990, police found Jorge Sanchez unconscious in a Mission District parking lot. His head had been smashed by a blunt object. Sanchez, who never regained consciousness, died in a hospital 46 days later, after his family and doctors decided to withhold antibiotic treatment.

Sanchez's death was one chapter in a feud between two street gangs based in San Francisco's Mission District. The evidence showed that defendant

---

[1] Defendant went by the street name "Pollito," a name which is often used in the record.

[2] Unless otherwise indicated, all further statutory references are to the Penal Code.

was a member of a Nicaraguan and Salvadorian gang known as 18th Street. The victim—who went by the street name "Brujo"—was a member of a rival Mexican gang known as "Trece."[3] Although the homicide at issue occurred on June 9, 1990, the trial court permitted the prosecution to present evidence of numerous incidents between 18th Street and Trece which occurred in the year before the homicide and which allegedly led up to the murder of Jorge Sanchez.

According to the prosecution's theory, the seminal incident in the recent rivalry between 18th Street and Trece occurred approximately one year before Jorge Sanchez was attacked. Specifically, on May 28, 1989, 18th Street member Carlos Banegas was walking down 22nd Street with several other 18th Street members when Jose Sandoval, a Trece gang member, charged Banegas with a knife and shovel. Dagoberto Ramirez, another 18th Street member, pulled a gun and shot Sandoval in the head, killing him. Defendant was not present during this incident.

About 10 months later, on April 12, 1990, defendant was with a friend at Hawthorne School when two Trece members shot at them. One of the shots hit defendant's friend in the arm. About three weeks after the schoolyard shooting, 18th Street retaliated. On May 5 Ronnie Torres and his uncle Jose Soto were walking Soto's dog in the Mission District with Trece members Joaquin Hernandez and "Contra." Neither Torres nor Soto was a member of Trece, but Soto used to "hang around" with them. Near the corner of 17th and Folsom a group of more than 10 people approached Torres and his companions shouting "18th Street." Hernandez yelled "fuck 18th Street, Trece Street," then ran. "Contra" ran too, but Torres and Soto remained on the sidewalk. Some of the 18th Street group chased Hernandez, while others attacked Torres and Soto. The attackers hit Torres and the dog with a bat and stabbed Soto in the neck. Joaquin Hernandez fled to a schoolyard where the attackers caught him and hit him with a bat, breaking his jaw. About two or three weeks later, Hernandez met defendant on the street and defendant admitted he was the one who had hit Hernandez with the bat.

Trece counterattacked two weeks after the attack related above. On May 19, 1990, 18th Street member Victor Alvarenga was standing in front of a restaurant on 25th Street with several friends when some Trece members drove up in a white car and hit Alvarenga in the head with a stick. He spent four days in the hospital recovering from the attack. Three days later 18th Street responded. On May 22, Christian Martinez and Andrew Molina were talking on San Carlos Street between 18th and 19th when three or four

---

[3]"Trece" means 13 in Spanish. Trece is sometimes referred to in the record as "Sureño" (southerner) or "13th Street." However, we refer to that group exclusively as "Trece."

people got out of an old gray Volkswagen and approached them. The group asked if Martinez and Molina were from Trece. Before Martinez could answer, someone in the group stabbed him in the chest and hit him on the back with a pipe. The attackers yelled "18th Street" as they fled. Martinez said that defendant was among the group who attacked him.

*The Week Before the Jorge Sanchez Homicide.*

The rivalry between 18th Street and Trece intensified during the week preceding the June 9, 1990, attack on Jorge Sanchez. On June 1, 1990, 18th Street gang members Mario Portillo (also known as "Weasel"), Marsiel Bermudez, Claudia Castillo and Ruth Reyes were walking near Garfield Park when they saw several Trece members drive by in a white car. About 15 minutes later, the car returned and the occupants fired 5 rounds at several members of 18th Street who were listening to music in Garfield Park. One shot hit Claudia Castillo in the leg, and another bullet struck Ruth Reyes in the back. After the police and ambulance arrived, Mario Portillo saw defendant and told him that Trece was responsible for the drive-by shooting of the two girls. During the next few days, defendant made statements to the two shooting victims and to other 18th Street members indicating that 18th Street would retaliate against Trece.

Three days after the drive-by shooting, 18th Street struck back. On June 4, 1990, three Trece gang members were driving in a Monte Carlo near 24th and Mission when the driver pulled to the curb because the car had a flat tire. While the Trece members were parked and still inside the car, defendant and Mario Portillo got out of a blue Volkswagen bug and approached the Monte Carlo. Defendant used a baseball bat to smash the Monte Carlo's rear window while Portillo smashed the windshield with a tire iron. One of the Treces was hit in the head by defendant's bat.

Three days later, on the night of June 7, Mario Portillo and another 18th Street member were cruising in a stolen car they had borrowed from a group that hung out around 22nd and Bryant streets. According to Portillo, they were trying to find members of Trece. Defendant and two other 18th Street gang members followed in the blue Volkswagen bug. About midnight the two cars stopped at a gas station on 19th and South Van Ness. About that time Officer Ron Ophir arrived on the scene and decided to investigate because he thought there was some sort of dispute at the gas station. Ophir ran a radio check and discovered that the borrowed car was stolen. He searched the stolen vehicle and found a loaded handgun inside. According to Portillo, the people who had lent him the car had left the gun inside.

Finally, about 1 a.m. on June 9, 1990, approximately one-half hour before Jorge Sanchez was attacked, two 18th Street members, Elvis Roldan and

Marvin Gaza, threatened and chased a PCP dealer who they believed had burnt them in a drug sale. The two gang members also caught and stabbed the dealer's brother. There was conflicting evidence as to whether defendant was present during this incident. Moreover, there was no evidence that the dealer or his brother were Trece members.

*The Jorge Sanchez Homicide.*

Defendant spent the day before the Jorge Sanchez homicide (June 8) hanging out with several 18th Street members, including Mario Portillo. Defendant drank, used LSD and smoked crack cocaine. Mario Portillo smoked PCP, crack and marijuana and drank 17 to 18 beers.

At some point in the late evening, defendant, Mario Portillo, and two other 18th Street members cruised Mission Street in the blue Volkswagen. At 22nd and Mission defendant and Portillo got out of the Volkswagen to wait for their friend Rudo. When Rudo arrived the trio started walking down the street until they saw Victor Navarro pass by in a white pickup truck. Defendant asked for a ride and Navarro agreed. All three got into Navarro's truck and defendant instructed Navarro to follow the blue Volkswagen, which had returned. It was then about 1 a.m. on the morning of June 9.

At about that time, David Mendez and Jorge Sanchez, who were both connected to Trece, were walking down Mission near 20th when Mendez saw a blue Volkswagen which he knew belonged to 18th Street gang members. Hoping to avoid a confrontation Mendez and Sanchez crossed Mission Street and walked through the parking tunnel beneath the El Capitan Hotel, which led to an open parking lot in back of the hotel. When Mendez and Sanchez ascended a ramp leading from the parking lot behind the El Capitan Hotel to a sidewalk on Capp Street the blue Volkswagen and Navarro's truck were already parked nearby on Capp. Defendant and four or five other members of 18th Street were standing by the vehicles.

According to Mendez, he told Sanchez there were too many 18th Street members to fight. Both Sanchez and Mendez ran back down the ramp into the parking lot and headed for the tunnel which led to Mission Street. Five or six members of 18th Street, including defendant, pursued the two Treces. Defendant was armed with a baseball bat which he swung at Mendez as he chased him. Defendant chased Mendez through the parking tunnel and 20 or 30 steps down Mission Street before he stopped and returned to the tunnel. Mendez did not see what happened in the tunnel, but knew Sanchez did not make it out.

Navarro testified that he parked near the Volkswagen on Capp Street behind the El Capitan hotel. He remained in his truck when defendant and

Portillo got out. From inside the truck, Navarro saw the two Trece members walking from the El Capitan parking lot toward the sidewalk on Capp Street. An argument ensued between defendant and the Trece members. One of them threw a bottle at defendant and then they ran back through the parking lot toward Mission Street. According to Navarro, defendant grabbed an aluminum bat from the Volkswagen and chased the two Treces, yelling "get him, get him" and "18." Portillo and another 18th Street member also gave chase. From inside the truck, Navarro saw Mendez and Sanchez run into the parking tunnel. There, he saw defendant swinging the baseball bat in a downward motion towards another person. Although he only saw the "shapes" of defendant and the other person, Navarro heard yelling and screaming as defendant was swinging the bat. Defendant continued running and Navarro lost sight of him.

Portillo, who admitted being extremely high on drugs and alcohol at the time of the attack, related a slightly different version of the events. According to Portillo, he arrived on Capp Street at the back of the El Capitan Hotel in the Volkswagen with defendant. He did not remember riding in Navarro's truck. At some point, he heard defendant say "There goes a Trece guy." The Volkswagen stopped and defendant got out of the car and started walking toward the two Trece members. Portillo followed, grabbing a tire iron as he got out of the car. Defendant said "Are you looking for me?" One of the Treces responded by throwing a bottle at defendant. Defendant then ran after the two Treces with a bat in hand. Portillo also gave chase, running about 20 feet behind defendant. The two Treces ran down a ramp, through the parking lot, and into the tunnel under the El Capitan Hotel. Portillo stopped before he got to the tunnel because he was gasping for air. He lost sight of defendant and the two Treces. However, he heard a noise in the tunnel, like "something hard hit." When he went into the tunnel, he saw a person lying facedown on the ground; defendant was at the other end of the tunnel, almost on Mission Street. He came walking back with the bat in hand, and said "The other one got away, we just got this one." Meanwhile, another 18th Street member, Leon Gomez (also known as "Rana"), entered the tunnel. Gomez had something long and shiny in his hand, possibly metallic. He raised that object and swung down towards the head of the person on the ground. According to Portillo, "It made a sound just like he hit a coconut with a machete, just like it broke it open." The three 18th Street members then ran back to their vehicles and drove away.

Defendant testified in his own behalf. He claimed that he got out of Navarro's truck on Capp Street at the back of the El Capitan parking lot in order to get into the Volkswagen. As he did so he saw the "guys from Trece." Defendant asked them if they were looking for him. An argument

ensued and the Trece members threw two bottles at defendant. Defendant returned to the Volkswagen, grabbed the bat, and then started chasing the two Trece members. He chased Sanchez into the parking tunnel. There, Sanchez turned around to face defendant. He was holding something in his hand. Fearing that it was a knife, defendant stopped and threw the bat at Sanchez from about six or eight feet away. The bat hit Sanchez in the face and he fell down. Defendant picked up the bat and continued through the tunnel in pursuit of the other Trece. Defendant chased him a short distance down Mission Street, and then returned to the parking tunnel. Inside the tunnel, defendant saw Leon Gomez (Rana) hitting Sanchez on the head with a "big thing" in his hand. Defendant told Gomez to stop hitting Sanchez, "that it was already enough."

After the attack, defendant and Portillo returned to Navarro's truck yelling "let's go, let's go, let's go." Navarro had waited because defendant told him to and he was afraid defendant would do something to him if he did not wait. Navarro drove defendant and Portillo to Garfield Park, then went home.

Meanwhile, Tamara Inderbitzen was driving down Mission Street with a friend when she saw Mendez, whom she knew, running down the street. Believing something was wrong, she told her friend to pull over so she could speak with Mendez. At 17th and Mission Mendez got into the car and told Inderbitzen that 18th Street members were chasing him and Sanchez. Mendez, Tamara and her friend drove back to the parking tunnel under the El Capitan Hotel to look for Sanchez; there, they saw Jorge Sanchez lying in a "lake" of blood. Sanchez was convulsing, and there were clots of blood coming from his mouth, ears and nose. Tamara's friend went to call an ambulance, while Mendez—who was on parole—panicked and ran.

While Tamara was waiting for the ambulance, a group of Latin men drove by in a car that resembled the Volkswagen used by 18th Street. The men were pointing, laughing and "carrying on."

Officer Ron Ophir arrived at the scene at about 1:30 a.m. He found Sanchez in the tunnel facedown in a pool of blood. Sanchez was transported to San Francisco General Hospital. There, doctors found that Sanchez had suffered significant head injury which required surgery. The wound was a "blunt trauma" injury caused by a bat or some other long, rigid object. There was some indication that the primary blow was delivered while Sanchez was "freestanding" rather than when his head was supported against a wall or floor.

The following morning, defendant went to Garfield Park where he showed the bloodied baseball bat to two fellow gang members and told them "we

battered some sureños last night." During the course of this conversation, two police officers arrived to arrest the gang members to whom defendant was speaking. They did not arrest defendant, but did seize the baseball bat and took defendant in for questioning.

Jorge Sanchez died 46 days after the attack. According to the medical examiner, the cause of death was "acute bronchial pneumonia . . . caused by head injuries."

## DISCUSSION

A. *The Trial Court Properly Admitted Evidence of Gang Affiliation and Activity.*

Defendant makes two interrelated arguments which are best addressed as a single issue. First, defendant contends the trial court should have severed or bifurcated the gang affiliation charges alleged under section 186.22. Second, defendant contends that, even if bifurcation were not required, the trial court abused its discretion under Evidence Code section 352 when it admitted certain evidence of gang affiliation and activity. We find no prejudicial error.

The information contained two separate allegations under section 186.22. Count 3 charged defendant with the substantive crime of participating in a criminal street gang with knowledge that its members engaged in a pattern of criminal activity. (§ 186.22, subd. (a).) In addition, as an enhancement to the murder count, the information alleged that defendant had murdered Jorge Sanchez for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote and further criminal conduct by the gang. (§ 186.22, subd. (b)(1).) Both allegations required the prosecution to prove that defendant had aided a "criminal street gang" which had engaged in a pattern of criminal activity. To establish a pattern of criminal gang activity, the prosecution was required to prove that defendant's gang (18th Street) had committed two or more offenses enumerated in the statute. (§ 186.22, subd. (e).)[4]

Defendant moved to sever (or in the alternative to bifurcate) the allegations under section 186.22 on the ground that evidence of gang affiliation

---

[4]Section 186.22 provides in pertinent part: "(a) Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for one, two, or three years. [¶] (b)(1) Except as provided in paragraph (2), any person who is convicted of a felony which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal

and activity was prejudicial to defendant on the murder count. Prior to trial the superior court denied the motion to sever without prejudice. On the first day of trial, the trial court denied the motion to bifurcate, ruling, in essence, that evidence of gang affiliation and activity was relevant and admissible to prove motive, intent, malice and premeditation with respect to the murder charge. The trial court ruled that this evidence would be admissible even if there were no allegations under section 186.22. Consequently, defendant would not suffer prejudice if the gang affiliation charges and murder count were tried together, since evidence of gang affiliation and activity would come in in any event.[5]

---

conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one, two, or three years at the court's discretion. [¶] . . . [¶] (e) As used in this chapter, 'pattern of criminal gang activity' means the commission, attempted commission, or solicitation of two or more of the following offenses, provided at least one of those offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions, or by two or more persons: [¶] (1) Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245. [¶] (2) Robbery, as defined in Chapter 4 (commencing with Section 211) of Title 8 of Part 1. [¶] (3) Unlawful homicide or manslaughter, as defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1. [¶] (4) The sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances as defined in Sections 11054, 11055, 11056, 11057, and 11058 of the Health and Safety Code. [¶] (5) Shooting at an inhabited dwelling or occupied motor vehicle, as defined in Section 246. [¶] (6) Arson, as defined in Chapter 1 (commencing with Section 450) of Title 13. [¶] (7) The intimidation of witnesses and victims, as defined in Section 136.1. [¶] (8) Grand theft of any vehicle, trailer, or vessel, as described in Section 487h. [¶] (f) As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (8), inclusive, of subdivision (e), which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

[5]The trial court gave a lengthy explanation of its reasons for admitting the gang affiliation and activity evidence: .

"The Court has carefully read the case law cited in counsels' respective briefs. I have applied the facts of this case . . . [to] the evidentiary and legal principles enunciated in those cases. [¶] This Court has carefully weighed the probative value of this evidence against the prejudicial effect, particularly against the factual fabric of this case . . . . [¶] This court is of the opinion that the evidence of gang activity and gang affiliation and expert opinion relating thereto is admissible. [¶] This court has weighed and considered the pro and con of bifurcation of this evidence and rejects it as not appropriate to the facts and pleadings of this case. [¶] Therefore, the defendant's motion to bifurcate is denied and the People's motion to introduce this evidence is granted. . . . [¶] The case before me, there is a count of murder, a count of conspiracy and a count of participating in a street gang . . . . These crimes are motive-intensive . . . . Murder particularly concerns itself with the state of mind in various mental states. Malice, particularly implied malice, intent to kill, deliberations and premeditation. All state of mind, mental states are elements required to be proved. [T]he proof of which is usually by circumstantial evidence of which motive, that is why did they do it are issues to

Subsequently, the trial court separately considered each precursor event described in the statement of facts and determined that in each case the probative value of the evidence outweighed its prejudicial effect. Consequently, the court admitted evidence of all nine precursor events described in the statement of facts.

To resolve this issue we need not, and do not, address defendant's threshold argument that, *as a general proposition*, gang affiliation allegations under section 186.22 must be bifurcated from other charges at trial in order to insulate the defendant from the prejudice inherent in gang affiliation evidence. That issue is presently pending before our Supreme Court. (*People v. Canady* (1992) 4 Cal.App.4th 1 [5 Cal.Rptr.2d 211], review granted May 21, 1992 (S026025).)

█ Instead, we address a much narrower issue in this case. Namely, whether the trial court properly found that evidence of gang affiliation and activity was relevant to prove motive, malice, premeditation and intent *with respect to the murder charge in this case*. We conclude that the court did not err in this regard.

Cases have repeatedly held that it is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent. (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1054 [277 Cal.Rptr. 269]; *People v. Burns* (1987) 196 Cal.App.3d 1440, 1456 [242 Cal.Rptr. 573]; *People v. Harris* (1985) 175 Cal.App.3d 944, 957 [221 Cal.Rptr. 321]; *People v. Frausto* (1982) 135 Cal.App.3d 129, 140 [185 Cal.Rptr. 314].) Here, the evidence of gang membership and activity was clearly relevant to defendant's motive for attacking Sanchez and his intent in doing so. Consequently, as a general proposition, the trial court did not err in admitting the gang affiliation and activity evidence.

---

be resolved by the jury, . . . The same could be said for the aiding and abetting theory of which the natural and probable consequences of an act are matters that a jury will have to determine . . . . [¶] . . . [¶] There are three people involved in this case, this is a group activity, it is not the case of a lone . . . killer, there are conspiracy issues, group motive issues, . . . This applies to aiding and abetting principles, too, . . . What was the intent of the group, the mental state, was there deliberation, premeditation, was there a conspiracy? [¶] All of these things are matters that because of the pleading and the nature of the charges the Court has to take into consideration in determining the admissibility and relevancy . . . of the evidence . . . . [¶] . . . [¶] The case law that I have read teaches that motive is ordinarily the incentive for criminal behavior. Its probative value generally exceeds its prejudicial effect. [¶] Here the relationship between the attackers and the victims are matters of considerable importance to be decided. And, therefore, this motive type evidence, as far as I am concerned, is relevant and material. [¶] What triggered, if anything, this group conduct, three people getting out of the Volkswagen, running and chasing down and eventually causing the death of the victim? [¶] . . . Gang affiliation and activity is woven into the factual fabric throughout this case."

Nevertheless, defendant contends that, even if evidence of gang affiliation and activity were properly admitted in this case, the trial court went overboard when it admitted evidence of all nine incidents. As defendant's counsel puts it: "[T]he crux of the issue here presented lies in Evidence Code section 352—the question of the prejudicial impact of the evidence presented weighed against its probative value, and especially the cumulative prejudice which ensued from the admission of virtually every incident proffered by the prosecution."

We will disturb a trial court's exercise of discretion under Evidence Code section 352 only if the court's decision exceeds the bounds of reason. (*People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].) The trial court operated well within the bounds of reason in this case.

Defendant complains in particular that the trial court should not have admitted evidence of the incidents in which he was not involved and the incidents which involved attacks by Trece on 18th Street members. However, all of those incidents were relevant to the issue of motive (retaliation as part of an ongoing rivalry between the two gangs) and, if anything, the incidents where defendant was arguably not involved and where Trece attacked 18th Street members were less prejudicial to defendant than those where defendant clearly took an active role in retaliating against Trece.

In sum, the trial court properly admitted evidence of gang affiliation and activity to prove intent and motive with respect to the murder. Once the trial court made this decision, it did not abuse its discretion under Evidence Code section 352 when it permitted the prosecution to present the entire picture of the rivalry between Trece and 18th Street.

B. *The Trial Court Did Not Abuse Its Discretion When It Rejected Defendant's Request to Reopen His Case.*

The day after the jury began its deliberations, the jury foreman sent the following question to the court: "Is Mr. Funes right or left handed or can we know this information." The trial court responded: "You are bound by the evidence in the record. So I can't comment on it or say yes or no. So whatever is in the record, that is what you must decide the case on." The next morning defense counsel made a motion to reopen his case to present evidence that defendant was right-handed. Defense counsel argued that this evidence was relevant because the victim was struck on the left side of the head, and therefore it was unlikely a right-handed person, chasing the victim from behind, could have struck the blows. The prosecutor opposed the motion, arguing that the evidence would raise additional issues such as

whether Jorge Sanchez turned around, whether defendant held the bat in one or two hands, and whether defendant swung or threw the bat. The prosecutor added that he was surprised when the issue was not raised at trial, and when it wasn't, he "specifically stayed away" from the issue.

The trial court stated it was denying the request on the following grounds: "One is I would certainly have reopened the case before, even after the arguments if . . . it was just an inadvertent oversight. But now that the jury has sent out a note on the issue, both sides know that this is something apparently that may interest the jury. I don't know to the degree that it may interest them, but to do this now it puts, I think, the opponent, the District Attorney at a distinct disadvantage. [¶] If there is an issue or he would have good cause to believe that there is an issue that the jury is interested in I would have to grant him leave to call all of the percipient witnesses back to see what hand it was . . . . He might want to cross-examine on the issue of whether or not he is left handed or right handed; he might want to change all of his arguments in the case . . . and when I weigh all of that against the time consumed and all of the possible delays . . . I am going to exercise my discretion and the motion is going to be denied."[6]

The trial court clearly had discretion to order the case reopened. (§§ 1093, 1094; *People* v. *Rodriguez* (1984) 152 Cal.App.3d 289, 295 [199 Cal.Rptr. 433]; *People* v. *Newton* (1970) 8 Cal.App.3d 359, 383 [87 Cal.Rptr. 394].) ■ In determining whether a trial court has abused its discretion by refusing a defense request to reopen, we consider the following factors: (1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence. (*Newton, supra*, at p. 383; see also *People* v. *Goss* (1992) 7 Cal.App.4th 702, 706 [9 Cal.Rptr.2d 412].) ■ Applying these factors, we conclude the trial court did not abuse its discretion when it denied the defense motion to reopen.

First, the defense request came at an extremely late stage in the proceedings. The jury had already been deliberating for nearly a full day before defense counsel made his request.

Second, the defense could easily have introduced evidence concerning defendant's right-handedness during cross-examination of the prosecution

---

[6]After the court made its ruling, it received another note from the jury which read: "If the right, left hand issue is reconsidered can we have those results today?" The court responded: "The right or left hand issue is resolved. Whatever is in the record, whatever is in evidence you may consider."

witnesses, or during the defense case. The defense had access to all of the medical reports which indicated that such evidence might be relevant, and of course the defense was in the best position to know whether the defendant was right- or left-handed. Indeed, the prosecutor claimed he was surprised defense counsel had not raised this issue. "Whether a defendant exercised due diligence to locate a missing witness or discover new evidence is relevant to the issue of abuse of the court's discretion in denying a motion to reopen . . . ." (*People* v. *Green* (1980) 27 Cal.3d 1, 42 [164 Cal.Rptr. 1, 609 P.2d 468].) Here, the evidence was not even "new"; it was merely overlooked. This case stands in stark contrast to those cases where reviewing courts have found that trial courts have abused their discretion by rejecting a defense motion to reopen. In those cases the defense, through no fault of its own, discovered highly relevant new evidence late in the proceedings. (See *People* v. *Carter* (1957) 48 Cal.2d 737, 742-743, 757 [312 P.2d 665] [Neither defendant nor his counsel knew that a red cap similar to defendant's (which was important evidence found with a murder victim's wallet) had been found in another area.]; *People* v. *Frohner* (1976) 65 Cal.App.3d 94, 102-103, 109-110 [135 Cal.Rptr. 153] [Important defense witness located only after jury deliberations began.]; *People* v. *Newton, supra,* 8 Cal.App.3d at pp. 382-383 [Late in trial, defense counsel received a corrected transcript of police interview with eyewitness to shooting; in earlier version, transcript indicated witness said "I *did* get a clear picture, clear view of [assailant's] face . . . ." The corrected transcript indicated witness said he *"didn't* get a clear picture" of assailant's face. (Italics supplied.)].) Instead, this is a case where defense counsel had full access to the evidence before trial, but for tactical reasons or because of inadvertence and neglect he did not introduce the evidence.

Third, "one of the reasons underlying the requirement of diligence is that a jury may accord undue weight to evidence which is admitted close to the time deliberations begin." (*People* v. *Rodriguez, supra,* 152 Cal.App.3d at p. 295.) Here, that danger was particularly acute because the evidence would have come in after the jury had begun deliberations and in direct response to their request. Thus, although the evidence was certainly relevant, the jury may have given the evidence more weight than it deserved, and put the prosecution at an unfair disadvantage.

Finally, we must consider the significance of the evidence to the issues at trial. There is no question that defendant's right-handedness was relevant to the jury's decision on the homicide count. Nevertheless, the evidence was far from critical. As the court pointed out, the significance of the evidence depended, inter alia, on whether defendant used one or two hands and whether Sanchez turned his head before defendant struck him. Consequently,

if the evidence were admitted, the trial court would have had to permit the prosecution to reexamine all of the percipient witnesses regarding those facts.

Looking at all the facts—and in particular the fact defendant could have introduced evidence of his right-handedness before closing—we conclude the trial court did not abuse its discretion when it refused to permit defendant to reopen his case.

C. *The Trial Court Properly Instructed on the Proximate Cause of Death.*

Defendant next contends we must reverse his murder conviction because the trial court improperly rejected a special instruction on the proximate cause of the victim's death. We disagree.

As indicated in the statement of facts, Sanchez lingered in the hospital for 46 days before a medical decision was made to withhold antibiotics and he succumbed to "acute bronchial pneumonia . . . caused by head injuries." Dr. Bryan Andrews, one of the attending neurosurgeons who treated Sanchez, testified that Sanchez entered the hospital with a severe closed head injury and remained in a persistent vegetative state[7] until he died. The family, acting on what they believed would be Sanchez's wishes, decided to withhold antibiotic treatment to permit Sanchez to die. According to Dr. Andrews, Sanchez might have lived for as long as five years, but would eventually have succumbed to pneumonia. Pneumonia will inevitably reoccur in comatose patients until their lungs become so scarred that they die despite treatment. In the doctor's view, there was no ethical or legal obligation to continue to treat Sanchez with antibiotics, when the inevitable outcome was that he would remain in a persistent vegetative state and eventually die of pneumonia. According to Dr. Andrews, the chance of Sanchez actually recovering was "infinitesimally small." In his words, "[t]hese patients do not wake up."

Defendant contends that the decision to withhold antibiotics from Sanchez was arguably an independent intervening cause of death which shielded him

[7]Dr. Andrews allowed that Sanchez may have been "a tiny bit better than vegetative" on one day. According to the doctor, "[a] vegetative patient . . . may respond in a very basic sense to . . . pain. Their blood pressure may go up. They may grimace, but they aren't able to find the pain, push it away, do things that would be natural as a protective measure. This man [Sanchez] had a very, very gross and abnormal, but purposeful movement noted on one day. That is the 27th of June. [¶] And so in that sense he categorized no longer from a vegetative state but to what we would describe as a severely disabled state. [¶] I should note, though, that on subsequent exams this man lapsed back into a so-called vegetative state and was no longer able to purposefully localize."

from liability for homicide. Because there was evidence of such an independent intervening cause, defendant contends the trial court erred when it refused his instruction on intervening causes[8] and the lesser offenses of attempted homicide and assault. We conclude that, as a matter of law, the decision to withhold antibiotics was not an independent intervening cause. Consequently, the court was not required to instruct on this issue.

Although a trial court must instruct on every issue supported by substantial evidence, the court need not instruct on a theory which is not supported by the evidence. (*People* v. *Roberts* (1992) 2 Cal.4th 271, 313 [6 Cal.Rptr.2d 276, 826 P.2d 274]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1].) Here, substantial evidence does not support a theory of independent intervening cause.

■ In general, an "independent" intervening cause will absolve a defendant of criminal liability. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 131, p. 149.) However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." (*People* v. *Armitage* (1987) 194 Cal.App.3d 405, 420-421 [239 Cal.Rptr. 515].) On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" (*People* v. *Harris* (1975) 52 Cal.App.3d 419, 427 [125 Cal.Rptr. 40].)

■ Apparently, no California case has addressed the issue presented by this case. We conclude that on the facts of this case the decision to withhold

---

[8]The proffered instruction read: "A person who has injured another is not responsible for the other's death, even though the death would not have occurred but for the injury, if the death is the result of some other independent intervening cause. [¶] In this case you must decide from the evidence whether the acts of the doctors treating Jorge Sanchez constituted an independent intervening cause, so that those acts, rather than any act by the defendant, were the proximate cause of Sanchez' death. [¶] Whether an intervening cause is independent, and is therefore regarded as the proximate cause of a death, depends on whether it is a normal and reasonably foreseeable result of the defendant's original act. An intervening cause need not be unlawful or a violation of a duty in order to be independent within the meaning of this instruction. [¶] If, after considering all the evidence, you have a reasonable doubt as to whether an act of the defendant was the proximate cause of Sanchez' death, you must give the defendant the benefit of that doubt and find that his act was not the proximate cause."

antibiotics was, as a matter of law, not an independent intervening cause. Instead, it was a normal and reasonably foreseeable result of defendant's original act.[9]

The Washington Court of Appeals reached a similar conclusion in *State* v. *Yates* (1992) 64 Wn.App. 345 [824 P.2d 519]. There, the victim was diagnosed as being in a permanent vegetative state due to a gunshot to the head. The family and treating physicians removed the victim's respirator and feeding tube and she died shortly thereafter. (*Id.*, at p. 521.) The defendant argued that the trial court improperly rejected an instruction on independent intervening cause. In rejecting this argument, the *Yates* court observed: "When life support is removed, the cause of death is not the removal, but whatever agency generated the need for the life support in the first instance. . . . Here, then, the removal of food and water could not have been a legally cognizable cause of death, and the court properly refused the proposed instruction. [¶] . . . [Moreover], even if removal of life support could sometimes be a legally cognizable cause of death, there is no possible inference that either the inception or removal of life support was independent of whatever criminal agency caused [the victim's] condition. Rather, the *only* reasonable inference was that the life support was *not* independent of the criminal agency." (*Id.*, at p. 523, italics in original.)

Although the *Yates* court's first statement may be over broad, we agree that there are cases where the *only* reasonable inference is that the removal of life support or treatment is *not* independent of the defendant's criminal act. This is such a case.

Finally, defendant implies that the proximate cause instruction read to the jury (CALJIC No. 8.55 (5th ed. 1988)) places undue emphasis on physical or temporal nearness. (See *People* v. *Roberts, supra,* 2 Cal.4th at p. 313.) However, to the extent it did so, defendant could only benefit. (*Ibid.*) Jorge Sanchez did not die until 46 days after the attack.

In sum, the court did not err when it rejected the defense instruction on intervening cause.

---

[9]Although our Supreme Court has not addressed this issue, it has determined that merely inadequate medical treatment is not an independent intervening cause, while "grossly improper" medical treatment may constitute an independent intervening cause if it "is the *sole* cause of death and hence an unforeseeable intervening cause." (*People* v. *Roberts, supra,* 2 Cal.4th at p. 312, italics added.) Here, the decision to withhold antibiotics clearly was *not* the sole cause of death.

### D. *The Trial Court Was Not Required to Give a Special Unanimity Instruction.*

Defendant's final argument challenges his conviction under section 186.22, subdivision (a) and the enhancement imposed under section 186.22, subdivision (b)(1). ▇▇▇ Defendant contends the trial court should have instructed the jurors that they had to unanimously agree on which two of several possible predicate offenses established that 18th Street had engaged in a "pattern of criminal gang activity," and was therefore a criminal street gang. (§ 186.22, subds. (e) & (f).)[10] We reject this contention.

As indicated, the jury convicted defendant of the separate crime of knowingly participating in a criminal street gang (§ 186.22, subd. (a)) and also enhanced his punishment for the murder by finding that defendant had committed that crime "for the benefit of, at the direction of, or in association with [a] criminal street gang, with the specific intent to promote . . . criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1); see *People* v. *Gamez* (1991) 235 Cal.App.3d 957, 973-974 [286 Cal.Rptr. 894].) In each case, the prosecution had to establish that 18th Street was a "criminal street gang" as defined in the pertinent statutes. (See *People* v. *Green* (1991) 227 Cal.App.3d 692, 701-702 [278 Cal.Rptr. 140]; *In re Lincoln J.* (1990) 223 Cal.App.3d 322, 327, 330-331 [272 Cal.Rptr. 852].)

Section 186.22, subdivision (f) defines "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e),[11] which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in *a pattern of criminal gang activity.*" (Italics added.)

Section 186.22, subdivision (e) provides in pertinent part that " 'pattern of criminal gang activity' means the commission . . . of two or more [specified offenses[12] within a three-year period], [which] are committed on separate occasions, or by two or more persons . . . ."

In essence, in order to prove that 18th Street was a "criminal street gang," the prosecution had to show (among other things) that members of 18th Street committed two or more specified offenses (e.g., assault with a deadly

---

[10]For the pertinent text of section 186.22, see footnote 4, *ante.*

[11]These crimes include assault with a deadly weapon, robbery, homicide, many drug-related offenses, shooting at an inhabited dwelling or occupied vehicle, arson, intimidating witnesses or victims, and grand vehicle theft. (§ 186.22, subd. (e)(1) to (e)(8).)

[12]See footnote 4, *ante.*

weapon or homicide) within a given time frame. The prosecution introduced evidence of at least five separate incidents which would have satisfied this requirement: (1) The May 1989 shooting of Jose Sandoval by 18th Street member Dagoberto Ramirez; (2) the May 5, 1990, attack on Jose Soto, Ronnie Torres and Joaquin Hernandez by a large group of 18th Street members; (3) the May 22, 1990, attack on Christian Martinez and Andrew Molina by a group of three or four 18th Street members; (4) the June 4, 1990, attack on the Trece's Monte Carlo by defendant and Portillo; and (5) the attack on the PCP dealer and his brother by 18th Street members Elvis Roldan and Marvin Gaza.

Defendant contends the jury had to unanimously agree on which two (or more) of the offenses described above were the predicate offenses which constituted a "pattern of criminal gang activity" under section 186.22. Because the trial court did not instruct on this point, defendant concludes we must reverse the conviction and enhancement under section 186.22. The *People* counter that no unanimity instruction was required because "a pattern of criminal gang activity" contemplates a continuous course of conduct. We agree with the *People* on this point.

■ This Division has recently addressed the "continuous course of conduct" exception to the unanimity requirement: "When the evidence tends to show a larger number of distinct violations of the charged crime than have been charged and the prosecution has not elected a specific criminal act or event upon which it will rely for each allegation, the court must instruct the jury on the need for unanimous agreement on the distinct criminal act or event supporting each charge. [Citations.] [¶] 'Neither instruction nor election are required, however, if the case falls within the continuous course of conduct exception. This exception arises in two contexts. The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.] [¶] This second category of the continuous course of conduct exception has been applied to a limited number of varying crimes, including pimping [citation], pandering [citation], failure to provide for a minor child [citation], contributing to the delinquency of a minor [citation], and child abuse [citation].' [Citation.] [¶] To this exemplary list could be added spousal battery [citation], annoying or molesting a child [citation], acting as accessory to a felony [citation] and dissuading a witness from testifying [citation]." (*People* v. *Avina* (1993) 14 Cal.App.4th 1303, 1309 [18 Cal.Rptr.2d 511].)

■ Here, the charged predicate crimes were not closely connected in time; ". . . thus, we are concerned with only the second aspect of the

continuous-course-of-conduct exception, i.e., when ' "the statute defining the crime may be interpreted as applying . . . to an offense which may be continuous in nature . . . ." ' " (*People* v. *Avina, supra,* 14 Cal.App.4th at p. 1309.) However, it should be noted that section 186.22 is different from the usual continuous course of conduct case. In the usual case, it is the *defendant* who must commit the underlying multiple acts which constitute the continuing course of conduct, and the defendant is punished for engaging *in that course of conduct.* For example, a defendant will be punished for his own course of conduct which amounts to pimping, child abuse or contributing to the delinquency of a minor.

By contrast, in this case we are not concerned with the defendant's behavior but with the behavior of a group: the alleged "criminal street gang." Moreover, a "pattern of criminal gang activity" by the "criminal street gang" is merely an *element* of the offense and enhancement defined in section 186.22, and does not constitute the crime or enhancement itself.[13] (*In re Leland D.* (1990) 223 Cal.App.3d 251, 258 [272 Cal.Rptr. 709].) Nevertheless, we still believe the "continuous course of conduct exception" may be applied in this case because the pertinent element—the "pattern of criminal gang activity"—*itself* contemplates a continuous course of conduct of a series of acts over a period of time. (*People* v. *Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516].) We see no reason why this exception should not apply to an element of a crime.

Prior decisions on the continuous course of conduct exception focus " 'on the statutory language in an attempt to determine whether the Legislature intended to punish individual acts or entire wrongful courses of conduct.' " (*People* v. *Avina, supra,* 14 Cal.App.4th at p. 1310, quoting *People* v. *Salvato* (1991) 234 Cal.App.3d 872, 882 [285 Cal.Rptr. 837].) "[C]ertain verbs in the English language denote conduct which occurs instantaneously, while other verbs denote conduct which can occur . . . over a period of time." (*People*

---

[13]In other words, it was not enough for the prosecutor in this case to prove that 18th Street was engaged in a "pattern of criminal gang activity" and that it met the other statutory requirements of a "criminal street gang." To secure a conviction under section 186.22, subdivision (a), the prosecutor also had to prove that defendant (1) "participated" in that gang; (2) "with knowledge that its members engage in or have engaged in a pattern of criminal gang activity"; and (3) willfully promoted or assisted the felonious criminal conduct of the gang. With respect to the enhancement under section 186.22, subdivision (b)(1), the prosecutor had to prove defendant committed the murder "for the benefit of, at the direction of, or in association with" the criminal street gang, and "with the specific intent" to aid the gang's criminal conduct. (See *People* v. *Gamez, supra,* 235 Cal.App.3d at pp. 972-973.) In short, the jury's finding that 18th Street had engaged in a "pattern of criminal gang activity" and thus met the definition of a "criminal street gang" was necessary, but not sufficient, to attach criminal liability to defendant.

v. *Gunn* (1987) 197 Cal.App.3d 408, 415 [242 Cal.Rptr. 834].) The same can be said for nouns. Here, in defining a "criminal street gang," the Legislature required a "pattern" of criminal activity. The term "pattern" suggests that the Legislature was primarily concerned with an entire course of conduct, not with individual acts.[14] Consequently, we believe the "continuous-course-of-conduct exception" may be applied to the "pattern of criminal gang activity" element of section 186.22, subdivisions (a) and (b)(1). This means, of course, that the jury was not required to unanimously agree on which two or more crimes constituted 18th Street's pattern of criminal activity.[15]

Finally, defense counsel cites several federal cases involving the Racketeer Influenced and Corrupt Organizations Act (RICO) and continuing criminal enterprises under 21 United States Code section 848. She claims those cases *require* jury unanimity on the specific predicate offenses which underlie the continuing criminal enterprise or RICO charge. (*U.S.* v. *LeMaux* (9th Cir. 1993) 994 F.2d 684, 689; *U.S.* v. *Pungitore* (3d Cir. 1990) 910 F.2d 1084, 1136; *U.S.* v. *Hernandez-Escarsega* (9th Cir. 1989) 886 F.2d 1560, 1572-1573; *U.S.* v. *Echeverri* (3d Cir. 1988) 854 F.2d 638, 642-643.) However, only *Echeverri* clearly held that unanimity was required on the three predicate offenses which constitute a continuing criminal enterprise under federal law. (854 F.2d at pp. 642-643.) In the other cases cited by defense counsel, the reviewing courts did not find it necessary to decide the issue because they found the failure to instruct harmless or because the trial court had actually given a unanimity instruction. (*LeMaux, supra,* at p. 689 [harmless]; *Pungitore, supra,* at p. 1136 [instruction given]; *Hernandez-Escarsega, supra,* at p. 1572 [harmless].)

---

[14]Webster's defines "pattern" in pertinent part as "an established *mode* of behavior . . . held in common by the members of a group." (Webster's New Internat. Dict. (3d ed. 1970) p. 1657, italics added.)

[15]Both sides cite cases which discuss whether a jury must unanimously agree on a single "overt act" to support a conspiracy conviction. The weight of authority seems to be that unanimity is not required on this issue, because an overt act is part of the theory of the case, not an element of the crime. (See, e.g., *People* v. *Jones* (1986) 180 Cal.App.3d 509, 516 [225 Cal.Rptr. 697]; *People* v. *Godinez* (1993) 17 Cal.App.4th 1363, 1367 [22 Cal.Rptr.2d 164]; *People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 233-235 [15 Cal.Rptr.2d 112]; *People* v. *Cribas* (1991) 231 Cal.App.3d 596, 611-612 [282 Cal.Rptr. 538].) However, there is contrary authority in dicta which indicates that an overt act *is* an element of conspiracy, and subject to the unanimity requirement. (*Cribas, supra,* at pp. 611-612; *People* v. *Ramirez* (1987) 189 Cal.App.3d 603, 611-615 [233 Cal.Rptr. 645]; *People* v. *Brown* (1991) 226 Cal.App.3d 1361, 1369 [277 Cal.Rptr. 309].) We do not find these cases relevant to the issue under consideration. Although a finding that a gang engaged in a "pattern of criminal gang activity" is unquestionably an element of the offense and enhancement charged in this case, that element *itself* involves a continuous course of conduct and is not subject to the unanimity requirement.

More fundamentally, however, federal courts generally follow the so-called *Gipson*[16] rule, which holds that the jury must agree on the principal factual elements and theory underlying a specific offense. (*People* v. *Davis* (1992) 8 Cal.App.4th 28, 35 [10 Cal.Rptr.2d 381]; *People* v. *Sutherland* (1993) 17 Cal.App.4th 602, 613-614 [21 Cal.Rptr. 752].) By contrast, California courts generally follow the more liberal *Sullivan*[17] rule which permits a jury to convict a defendant even if they disagree about particular theories (and to some degree facts), but do agree on the ultimate issue, i.e., whether the defendant is guilty of the charged offense. (*Davis, supra,* at pp. 34, 40, 44.) Consequently, there is apparently no federal analog to the "continuous course of conduct" exception found in California law. Since we rely on that exception in this case, we do not find the federal authorities on this issue persuasive.

The judgment is affirmed.

Merrill, J., and Werdegar, J., concurred.

A petiton for a rehearing was denied April 25, 1994, and appellant's petition for review by the Supreme Court was denied July 14, 1994. Werdegar, J., did not participate therein.

---

[16]*United States* v. *Gipson* (5th Cir. 1977) 553 F.2d 453, 457-458.
[17]*State* v. *Sullivan* (1903) 173 N.Y. 122 [65 N.E. 989].