Filed 1/3/14  P. v. Velazquezrosales CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>KARLA MARIA<br>VELAZQUEZROSALES,<br><br>    Defendant and Appellant. | G046790<br><br>(Super. Ct. No. 10NF1332)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed as modified.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Karla Maria Velazquezrosales of attempted murder with premeditation and deliberation. (Pen. Code, §§ 187, subd. (a), 664, subd. (a).) The jury also found defendant personally and intentionally discharged a firearm causing great bodily injury to the victim. (Pen. Code, § 12022.53, subd. (d).) The trial court sentenced defendant to seven years to life for attempted murder and a consecutive term of 25 years to life for the gun enhancement (for a total of 32 years to life in state prison).

We reject defendant's claim that the court erred by refusing to reopen the case to allow defendant to impeach the prosecution's rebuttal witness. We likewise reject defendant's assertion that the court erred by imposing a $10,000 restitution fine. (Pen. Code, § 1202.4.) But, as conceded by the Attorney General, the court erred in its calculation of custody credits. We therefore modify the judgment to reflect the correct number of custody credits and affirm the judgment as modified.

FACTS

Sherry Tyson was shot in the stomach on May 2, 2010. Tyson suffered a potentially fatal injury to her liver and endured multiple surgeries. According to Tyson, defendant shot her. According to defendant (who admitted in her testimony that she was present at the scene of the crime), a man named "Vadi" (and nicknamed "Prowler") was the perpetrator. Although defendant does not challenge the sufficiency of the evidence in support of her conviction, we summarize the evidentiary record to contextualize defendant's claim that the court erred when it refused her request to reopen the case to allow the presentation of additional evidence relating to defendant's claim that Vadi committed the crime.

*Evidence Supporting the Prosecution's Theory of the Case*

At the time Tyson was shot, her son was in juvenile hall on an attempted murder charge. Defendant had previously dated Tyson's son. So had a teenage girl named Lauren, who remained friends with Tyson's son and was sleeping at Tyson's apartment at the time of the incident. At about 12:30 a.m. on the night in question, Lauren (while she was sleeping) received a voice mail message from defendant calling Lauren a "hoodrat" and a "fucking bitch."

At approximately 1:00 a.m., someone knocked on Tyson's door. Tyson saw defendant outside her apartment. After opening her door, Tyson also noticed a male individual "from the neighborhood" she knew only as Vadi.[1] Defendant told Tyson she had heard Lauren was looking for defendant. Tyson shut the door. Tyson observed defendant through the peephole; defendant covered the peephole with gum. Tyson opened the door and removed the gum. Tyson no longer saw defendant or Vadi.

After Tyson threw away the gum, she heard a noise in her backyard. Tyson opened the blinds to investigate and saw defendant. Tyson told defendant to get out of her backyard, adding, "I'm not playing with you." Defendant responded by turning toward Tyson with a gun and saying, "I'm not playing with you either." Tyson asked, "What are you going to do? Shoot me?" Defendant shot Tyson shortly thereafter. While Tyson was the only one to see defendant, a witness inside Tyson's residence testified that she heard a *female* voice interacting with Tyson prior to the shooting.

Lauren and the second witness inside Tyson's residence called 911 immediately after the shooting. Tyson can be heard screaming and moaning in the background of both calls. Tyson can also be heard identifying "Karla" (defendant's first name) as the shooter. Both callers identified Karla as the shooter based on the statements of Tyson, not as a result of independently witnessing the shooting.

---

[1] Police were unable to locate or identify anyone named "Vadi."

When a police officer arrived, he found Tyson on the floor inside the apartment, holding her hands to her bloody stomach and screaming in pain. When the officer asked Tyson who had shot her, she screamed, "Karla shot me." Another police officer met Tyson at the hospital. The officer heard Tyson state, "Karla shot me and she was close."

A third police officer already in the neighborhood at the time of the shooting observed a female sprinting down the sidewalk; the female matched a description the officer had received of the suspect in the shooting of Tyson. The suspect refused the officer's call to stop, but instead ran away from the officer into an apartment complex. Defendant was later arrested inside one of the apartments in this complex. Police subsequently found a handgun in a dumpster along the route taken by the fleeing female suspect. A firearm expert opined that a bullet casing obtained from Tyson's backyard was fired by the gun recovered from the dumpster.

*Defendant's Testimony*

Defendant testified on her own behalf. In May 2010, defendant lived with her mother in Anaheim. In the past, she had lived with Tyson and her son. Tyson's son and Vadi (nicknamed Prowler) were both members of the gang known as Chicanos Kicking Ass (C.K.A.).

Approximately one month before defendant's arrest, Tyson's son was arrested for attempted murder. Defendant was with Tyson's son at the time of the shooting, and defendant told police that Tyson's son was present with a gun during the shooting. When defendant told Tyson she had spoken with police, Tyson called defendant a "rat." Defendant and Tyson argued, but Tyson eventually calmed down. They discussed the idea of defendant marrying Tyson's son, so defendant would not be forced to testify against Tyson's son.

4

Tyson asked defendant to hide the gun used in the incident for which her son was being charged. Defendant did not comply. Tyson buried the gun in her backyard. At some point, defendant saw Tyson dig up the gun and hand it to Vadi.

Defendant helped Tyson obtain methamphetamine from Vadi, so Tyson could sell it to pay her rent. Defendant agreed with Vadi that she would be responsible for payment if necessary. On the day of the shooting, defendant approached Tyson to request payment of the methamphetamine debt. Defendant noticed Tyson and Lauren smoking the methamphetamine instead of selling it.

That night, defendant returned to Tyson's house with Vadi, again to collect payment for the methamphetamine. Defendant was not aware that Vadi had a gun. Defendant knocked on the front door and talked to Tyson. After talking to Tyson, defendant walked toward the backyard with Vadi to seize Tyson's personal property, as a way of collecting the drug debt. As defendant tried to climb over the wall to get into the backyard, Vadi was in the backyard examining Tyson's belongings. Tyson opened her door and confronted defendant. When Tyson again refused to give anything to Vadi, Vadi pulled out a gun and shot through the glass door.

Defendant heard the gun and the breaking glass, but ran home without seeing the incident unfold. She did not know if anyone was actually shot. Defendant denied ever handling a gun before, let alone on that day specifically. She denied shooting Tyson and denied knowing Vadi was going to shoot her.

*Rebuttal Testimony*

The People recalled Brian Browne, a gang investigator with the Anaheim Police Department, as a rebuttal witness. Browne explained he had primary responsibility for investigating the C.K.A. gang between 2008 and 2010 (through and including May 2010, when the crime at issue occurred). Browne had never heard of the name "Vadi" or "Prowler" in association with the C.K.A. gang prior to the incident in

5

question. Browne did not recall ever seeing any graffiti with the name Vadi or Prowler in the neighborhoods he investigated. After Browne's rebuttal testimony, the parties rested and the trial court gave instructions to the jury before adjourning for the day.

*Motion to Reopen Case*

The next morning, before closing argument, defense counsel moved to reopen the case to offer surrebuttal evidence. Defense counsel's offer of proof consisted of two photographs depicting "the word 'Prowler' in silver spray paint, and it's crossed out in red paint." The photographs were taken by the defense investigator the night before (Jan. 30, 2012), in the neighborhood of the crime at issue. Defense counsel asked to call the defense investigator and a local resident who would testify that she estimated the graffiti had been present for two months. Defendant offered this evidence to rebut the police officer's testimony that he had never heard of "Prowler." Defense counsel estimated it would take seven minutes to present the evidence.

The prosecutor, suggesting the evidence might have been fabricated by defendant's family, stated that the police were called out to inspect the graffiti the previous night by defendant's mother, who had sat in the courtroom the previous day. The defense investigator arrived while the police were responding to the call from defendant's mother. The prosecutor also argued that the appearance of graffiti identifying Prowler in late 2011 was irrelevant to the time period at issue (i.e., May 2010). Finally, the prosecutor complained that Browne was not available to testify in order to respond to the new evidence should it be admitted. Thus, the trial would be delayed if the court agreed to allow the prosecutor to recall Browne to the stand.

The court denied the defendant's motion to reopen. The court reasoned that the graffiti was, at most, two months old. The relevant time period to impeach Browne was between 2008 and 2010. Moreover, nothing in the offer of proof suggested that the Prowler named in the graffiti was related to the Vadi/Prowler identified by defendant as

6

the perpetrator of the attempted murder. As the court explained, "I don't know whether somebody new named Prowler came along after the incident."

DISCUSSION

*The Court Did Not Abuse Its Discretion by Denying the Motion to Reopen*

Defendant contends the court abused its discretion by denying her motion to reopen the case for surrebuttal evidence, thereby impinging upon her constitutional rights to due process and a fair trial. In particular, defendant claims she was prevented from rebutting Browne's testimony, which arguably called into question defendant's testimony that Vadi was a C.K.A. gang member, with the moniker Prowler, at the time of Tyson's shooting in 2010. Browne's lack of familiarity with the names Vadi or Prowler during his stint as the primary investigator of the C.K.A. gang from 2008 to 2010 may have affected the jury's evaluation of defendant's testimony.

Pursuant to Penal Code sections 1093 and 1094, trial courts have "discretion to order the case reopened" for the presentation of additional evidence. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520.) "In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.'" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)[2]

---

[2] "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.] A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently

7

The first two factors are inconclusive. As to the first factor, defense counsel's request to reopen was made the morning after the close of evidence and the instruction of the jury, before closing argument had begun — i.e., not too late in the game. But the case was ready to be submitted to the jury after closing argument (which proceeded immediately after the court denied the motion), and the prosecutor stated he wished to recall Browne (who was not available that day) to respond to the new evidence should it be admitted. Thus, granting the motion potentially could have led to significant delay even though defense counsel estimated a need for only seven minutes to present the Prowler graffiti evidence. As to the second factor, it did not become apparent that the lack of graffiti identifying Vadi or Prowler would be prosecution evidence in the case until Browne's rebuttal testimony at the close of evidence. On the other hand, defendant's theory of the case was that Vadi/Prowler was a C.K.A. gang member who shot Tyson. And there are indications in the record that defendant's family reported the graffiti to police and defense counsel. Reasonable minds can disagree about whether the timing of the discovery of the Prowler graffiti speaks to the diligence of defendant or defense counsel.

The key to our conclusion that the court did not abuse its discretion is the lack of significance of the proffered evidence and the prospect that the jury might accord undue emphasis to essentially irrelevant evidence. The evidence proved (at best) that the word "Prowler" was spray painted on a wall two months prior to the end of trial, about one and one-half years after the attempted murder of Tyson. Defendant did not offer to prove who performed the graffiti or to prove (perhaps through expert testimony) the meaning of the graffiti. It is difficult to understand how this evidence supported the defense theory of the case (i.e., that a C.K.A. gang member named Vadi/Prowler shot

grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

8

Tyson because of a drug debt). It was already undisputed that someone named Vadi was present on the night of the shooting. Defendant ascribed gang membership and drug dealing to Vadi, attributes that might make a jury more likely to believe he would shoot Tyson. But the fact that someone wrote Prowler on a wall, by itself, is not evidence that there is an individual named Prowler in the C.K.A. gang (either in 2010 or late 2011), or that Prowler had a relationship to the individual known as Vadi who was present on the night of Tyson's shooting. It certainly has no bearing on the question of who pulled the trigger. The proof offered by defense counsel was irrelevant to the issues presented in this case. (See *People v. Marshall* (1996) 13 Cal.4th 799, 836 ["Although a criminal defendant is constitutionally entitled to present all relevant evidence of significant probative value in his favor, this does not mean the court must allow an unlimited inquiry into collateral matters; the proffered evidence must have more than slight relevancy"].)

Moreover, the Prowler graffiti evidence would not have logically impeached Browne. Browne testified about his lack of knowledge linking Vadi or Prowler to the C.K.A. gang from 2008 to 2010. Even if the jury were to believe (without any evidence to support such inferences) the graffiti was legitimate C.K.A. gang graffiti performed by someone identifying himself as Prowler, this evidence would not impeach Browne's testimony that he was unaware of any indication (including graffiti) from 2008 to 2010 that Vadi/Prowler was a member of C.K.A. There would have been a danger, however, that the jury could have placed undue emphasis on the existence of this graffiti for purposes of impeaching Browne (at least in the absence of the prosecutor being allowed to recall Browne to clarify his earlier testimony). In sum, the court was well within its discretion in denying defendant's motion to reopen for surrebuttal evidence.

*The Court Properly Imposed a Section 1202.4 Restitution Fine*

Defendant claims the court erred by imposing a $10,000 restitution fine pursuant to Penal Code section 1202.4 (section 1202.4). At the time of defendant's

9

offense (May 2010), this statute stated, "(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record. [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony . . . ." (Stats. 2009, ch. 454, § 1.) Defendant did not object or argue against the imposition of the maximum fine by the court.

Defendant chose not to speak with the probation department after her conviction. At that time, the court specifically ordered defendant "to prepare and file a disclosure identifying all assets, income, and liabilities . . . ." At sentencing, the court cited defendant's failure to prepare a financial disclosure form as one reason for its selection of the $10,000 amount. The applicable version of section 1202.4, subdivision (f)(5), provided in relevant part that "the defendant shall prepare and file a disclosure identifying all assets, income, and liabilities . . . as of the date of the defendant's arrest for the crime for which restitution may be ordered." (Stats. 2009, ch. 454, § 1.) The applicable version of section 1202.4, subdivision (f)(9), stated in relevant part that "[t]he court may consider a defendant's unreasonable failure to make a complete disclosure pursuant to paragraph (5) as any of the following: [¶] . . . [¶] (D) A factor indicating that the interests of justice would not be served by imposing less than the maximum fine and sentence fixed by law for the case." (Stats. 2009, ch. 454, § 1.)

Defendant argues on appeal that the court overemphasized her failure to comply with financial disclosure obligations, particularly because the court could have referred to other sources for an overview of defendant's financial circumstances.[3] But

_____

[3] Pursuant to the applicable version of Penal Code section 1202.4, subdivision (f)(6), a financial affidavit filed to obtain the appointment of counsel "shall serve in lieu of the financial disclosure required" by section 1202.4. (Stats. 2009, ch.

10

defendant's failure to object below precludes her argument that the court abused its discretion. (*People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 ["An objection to the amount of restitution may be forfeited if not raised in the trial court"].) The $10,000 fine selected by the court was within the range provided by the statute. Thus, defendant cannot contest the particular amount selected on appeal without having objected at the sentencing hearing.

We also note that defendant's arguments that the fine was unconstitutional fail on the merits. For one, the jury was not required to select the amount of the fine. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 349-352 [United States Supreme Court precedents requiring a jury rather than the court to make necessary factual determinations resulting in punishment do not apply to the court's imposition of the maximum $10,000 restitution fine].) And there was no ex post facto violation because the statutory maximum restitution fine was $10,000 both at the time of defendant's crime and in subsequent versions of section 1202.4. (Compare Stats. 2009, ch. 454, § 1 with § 1202.4, subd. (b)(1).)

*The Court Incorrectly Calculated Conduct Credits*

The court agreed with the prosecutor's argument at the sentencing hearing that defendant was not entitled to any presentence conduct credit. On appeal, the parties agree defendant is entitled to 107 days of presentence conduct credit, representing 15

454, § 1.) Presumably, defendant filed an earlier disclosure to obtain appointed counsel. Despite defendant's lack of cooperation in their investigation, the probation department had some information regarding defendant's finances. The $10,000 restitution fine exceeded the recommended fine in the probation report ($3,000), which also mentioned that it appeared defendant did not have the ability to pay the costs to prepare the report. The court separately found defendant lacked the ability to pay a separate $100 fine; it is unclear what the court examined in making this finding. In sum, it appears the court was on notice at least in general of defendant's lack of assets to pay $10,000. But the court also observed that the $10,000 restitution fine could be collected "from the defendant's earnings in prison . . . ."

percent of her 713 actual days in custody.  (See Pen. Code, §§ 2933.1, 4019; *People v. Brewer* (2011) 192 Cal.App.4th 457, 460-464.)  We agree with the parties' analysis.

## DISPOSITION

The judgment is modified to award defendant 107 days of conduct credit. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  The judgment is affirmed as modified.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MOORE, J.