Filed 9/11/15  P. v. Summers CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> TRAVON EDDIE SUMMERS, <br><br>     Defendant and Appellant. | B259913 <br><br> (Los Angeles County <br> Super. Ct. No. YA089368) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Scott T. Millington, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Timothy M. Weiner and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Travon Eddie Summers appeals from the judgment entered following his convictions by jury on five counts of attempted willful, deliberate, and premeditated murder (counts 1 – 5), one count of dissuading a witness (as a lesser included offense of count 7 – dissuading a witness for consideration), and count 8 – possession of a firearm by a felon, with findings as to each of counts 1 through 5 he personally used a firearm, and personally and intentionally discharged a firearm, a finding as to each of counts 1 through 7 he committed the offense for the benefit of a criminal street gang, and a court finding he suffered a prior prison term.  (Pen. Code, §§ 136.1, subd. (a)(2), 186.22, subd. (b)(1), 187, 664, subd. (a), 667.5, subd. (b), 12022.53, subds. (b) & (c), 29800, subd. (a)(1)).  The court sentenced appellant to prison for three consecutive terms of 15 years to life, plus 60 years.  We affirm.

## FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*)), the evidence established that on June 26, 2013, Vandalena Mahoney lived at 1027 South Osage in Inglewood.[1]  Mahoney testified as follows.  About 3:00 p.m. on June 26, 2013, Mahoney looked out her bedroom window and saw a person, whom she identified at trial as appellant, looking at her house from across the street.[2]  Mahoney called on the phone William Harrison (William), her son,

---

[1]    Photographic and testimonial evidence, discussed in detail later, established as follows.  The residence was located on the west side of South Osage.  A bedroom door was near the north end of a front wall that faced east towards the street.  A bedroom window was on that front wall and a short distance south of the bedroom door.  A short distance north of the bedroom door, a garage wall extended east from the front wall.  The juncture of the two walls was the northwest corner of a cement courtyard in front of those walls.  The roof of the front wall extended east past that wall and overhung a portion of the courtyard, creating a shaded patio containing a small table and chairs.  A walkway extended from the courtyard, through the front yard grass, and towards the sidewalk.  The front yard was bounded on the south by a wire fence.  A tree was on the other side of the fence.

[2]    Mahoney referred to the person she saw across the street as "Lookie Loo."  Mahoney identified appellant at his preliminary hearing.  Mahoney previously had seen

2

and told him "the gang-banger . . . was looking at my house." Mahoney testified, "these guys been scoping out my house for three months."**[3]** During that three-month period, Mahoney had seen appellant walking on the street.

William, who lived at the house, drove a vehicle into its driveway, exited, and began walking towards the house. Mahoney, Sir, Armi, Nayvi, and James Harrison (James) were outside. James was Mahoney's son. Sir, Armi, and Nayvi were Mahoney's grandchildren. Sir, Armi, and Nayvi were five months old, five years old, and eight years old, respectively. Mahoney was sitting at the table (see fn. 1, *ante*). Sir was sitting in a baby seat on top of the table. Armi was behind Mahoney. James was "sitting out there, inside the door where the shooting occurred, but he was sitting right there by the little porch."

Nayvi was by the front door and was not sitting where Mahoney was. (The front door was not the bedroom door.) Mahoney, referring to People's exhibit No. 5, a photograph, testified the "front door is way to the left that you can't see on this picture." (*Sic*.) (All exhibits herein mentioned were photographs introduced into evidence by the People.) Referring to exhibit No. 1, Mahoney testified, "Nayvi is way to the left. You can't even see her. She's by the front door." Nayvi was not observable in exhibit No. 1.

William entered a gate to approach the house. Before William was near the door, appellant ran up by the tree (see fn. 1, *ante*) and started shooting. The prosecutor asked if Mahoney saw "him do that, jog up." She replied, "Yeah, I seen his face." Appellant fired five shots. Mahoney jumped up from the table to shield Sir. Mahoney looked at

---

appellant in a photographic lineup but, because her family was in jeopardy, falsely told police she could not identify him. Mahoney was adamant at trial that Malcolm Barnett was not the shooter.

**3** In February 2013, a member of the Legend Crips gang (Legend) approached William, a member of the Bad Ass Gangsters gang (Bad). The Legend member pointed a gun at William and asked where he was from. William identified his gang and the Legend member said, "Fuck Mangos," a derogatory reference to Bad.

appellant and he was still shooting, holding the gun in two hands extended in front of him. Mahoney testified appellant was pointing the gun "towards where we were all sitting." The gun appeared to be a .45-caliber handgun. Mahoney stood with her arms extended, shielding Sir.

When appellant began shooting, James told William to get down. William fell and, had he not fallen, he would have been shot in the head. Mahoney grabbed Sir and brought him into the house. Mahoney returned, stood in the walkway in her yard, and appellant fired the fifth and last shot. Mahoney was standing "a little bit in front of [a] pot [depicted] in the middle of [exhibit No. 7] to the left of the basketball hoop." Mahoney looked directly in appellant's face when he fired the last shot. William and James were gone. Mahoney yelled profanity at appellant, who fled.

Mahoney also testified as follows. Exhibit No. 1, a photograph of the front of the house, depicted "where we all [were] sitting when the shooting occurred." Mahoney was sitting by the window. Mahoney wrote the words Armi and William on the exhibit to reflect where they were. The word William indicated where William fell. Mahoney, Armi, and Sir were probably two feet from William. The prosecutor asked if a bullet hit anywhere in the porch area. Mahoney replied, "The bullet is still there. It's up in here." She then, using exhibit No. 1, pointed near the top of a depicted gutter and to the left of an awning and testified, "[t]he hole is right there." A black circle on the exhibit marked the location of the hole. The hole was about one foot from where William fell. Mahoney found no other bullet holes.

On the morning of June 27, 2013, Mahoney found a "bullet shell." Mahoney testified exhibit No. 5 depicted the "front of the house," i.e., the porch. The exhibit also depicted "where we all [were] sitting, me, Armi, Nayvi" and "where [Mahoney] found the bullet." A black circle on the exhibit marked where she found the "bullet shell." (The exhibit depicts the black circle in front of, i.e., east of, the table.) Mahoney put a cigarette lighter where she found the bullet shell, and exhibit No. 5 depicted where she

4

put the lighter. Mahoney gave the bullet shell to Inglewood Police Detective Daniel Milchovich. Exhibit No. 5 also depicted the bedroom door.

Mahoney further testified she wrote the letter X on exhibit No. 2 to reflect where the shooter (appellant) was. The letter X was next to the tree, which was depicted in the photograph. On exhibit No. 7, Mahoney wrote the initials A, M, S, J, and W to indicate where Armi, Mahoney, Sir, James, and William were, respectively, at the time of the shooting. According to those initials, William was on the right side of the porch, under the eave leading to the bedroom door. James was left of William and "towards the bedroom door." The distance between the table and tree (the location of the shooter) was 49 feet. (The tree was southeast of the table.) During cross-examination, Mahoney testified appellant "almost killed my grandkids" and "[h]e was shooting at everybody. We don't know who he was shooting at. We all was out there. It wasn't just William."

James testified as follows concerning the incident. James was in the front yard and William walked into the yard. Appellant jogged to a tree at a fence and pulled out a .40- or .45-caliber gun. James heard "about five or six" shots. Appellant was pointing the gun at William. James was behind William and closer to the house. Mahoney and the children were sitting in the chairs at the table to the right of James. When appellant fired the shots, James pushed William down and said "[h]e got a gun." James ran inside the house. William fell, began crawling, then stood and ran to the house. William made sure everyone was all right, then returned to the front yard.

James also testified as follows. Exhibit No. 15 depicted the area James had been describing and where everyone had been at the time of the shooting. James wrote on the exhibit Nayvi and Armi, the initials V.M., Sir, and the initials W.H. and J.H. to indicate where Nayvi, Armi, Mahoney, Sir, William, and James were, respectively, at the time of the shooting. James was near the basketball hoop adjacent to the garage wall. William was south of James. Armi and Nayvi were standing together. The distance between (1) the table and (2) James and William, who were near the basketball hoop, was about six or seven feet. Appellant pointed the gun at James and William, and nowhere else.

5

James looked at appellant "about a good 30 seconds" before James moved.  By the time James entered the house through the bedroom door, all shots had been fired.

James, using exhibit No. 17, pointed to a location left of Mahoney and further left of the depicted porch, and testified he could not really see Armi's location in the exhibit. James identified appellant as the shooter in a photographic lineup and at trial.  James had seen appellant once before when appellant was walking around the block.  James knew a person named Malcolm, and knew appellant and Malcolm were Legend members. James was uncomfortable testifying; his life was in jeopardy because he was snitching. Appellant was with a "Lookie-Loo" at some point before the shooting, but appellant was alone at the tree at the time of the shooting.

William testified as follows.  William walked in the yard, turned his back to the street, and James walked out and said, "Look out."  William heard five or six gunshots. William did not see where the shots came from.  He ran into the house.  After the last shot, Mahoney and James ran outside to see who was shooting.  Exhibit No. 20 depicted the patio where everyone was at the time of the shooting.  William wrote the words Bro and Me on exhibit No. 20 to indicate where James and William were, respectively, at the time of the shooting.  Based on those designations, James was south of William, and William was in front of and east of the table.  The bullet hole indicated by the dark circle near the gutter depicted on exhibit No. 20 was about two feet from William.

Mahoney's house was in Legend territory.  Bad and Legend were rival gangs. William testified that during a photographic lineup, he identified appellant's photograph as depicting the shooter.  At trial, William denied seeing the shooter.  However, when at one point the prosecutor asked William if appellant shot at the house, William replied, "Yeah, I guess."

Inglewood Police Officer Todd Furlong testified as follows.  About 3:15 p.m. on June 26, 2013, Furlong went to the residence.  Furlong arrived within five minutes of receiving the call.  He found a bullet or bullet fragment on the north side of the

6

porch. A black circle on exhibit No. 25 indicated where he found the bullet.[4] Milchovich testified as follows. Milchovich, a member of the Inglewood Police Department's gang investigation unit, was the lead investigator in the present case. On June 27, 2013, Milchovich went to the residence and found two .45-caliber casings by the tree. Mahoney gave him a "smashed projectile." Milchovich had her place a cigarette lighter where she found the projectile.[5] Appellant was 5'10" tall and 160 to 165 pounds.[6]

On July 27, 2013, police saw Malcolm Barnett discard a gun. A "fired bullet" obtained from Milchovich and bullet casings found at Mahoney's house were fired from that gun. On May 28, 2014, William received a note indicating he was to tell James to change his story. In response to a hypothetical question based on evidence, Inglewood Police Officer Jose Barragan, a gang expert, testified the present offenses were committed for the benefit of Legend.

In defense, appellant, who had suffered two prior convictions for possession of narcotics for sale, presented an alibi defense. Appellant wanted Patterson to go to Mahoney's house to tell her the truth. Appellant prepared a letter to William, asking him why William's brother was lying.

---

[4] About 4:00 p.m., Inglewood Police Officer Ben Sanza was driving in a patrol car near 527 East 97th Street in Inglewood. Appellant looked at the patrol car and later fled. Sanza yelled for appellant to stop, appellant looked in Sanza's direction, but appellant continued fleeing out of view.

[5] On June 28, 2013, Inglewood Police Officer Adam Butler saw appellant at 524 East 97th Street. Other police arrived in front of the property and appellant began walking to its rear where Butler was. When appellant saw Butler, appellant turned towards the front of the property but police there detained him. On July 16, 2013, appellant, in jail, had his girlfriend Kamia Patterson go to Mahoney's house and attempt to dissuade Mahoney from testifying (count 7).

[6] Mahoney told Milchovich the shooter was 5'5" to 5'8" tall and 190 to 205 pounds, and the shooter was Malcolm Barnett. However, when Milchovich showed Mahoney a photographic lineup containing Malcolm Barnett's photograph, she identified Barnett but denied he had anything to do with the shooting.

7

*ISSUES*

Appellant claims (1) there is insufficient evidence of intent to kill supporting his convictions on counts 1, 2, 4, and 5, (2) there is insufficient identification evidence supporting his convictions on counts 1 through 5, (3) the trial court erred as to counts 1, 2, 4, and 5 by using CALCRIM No. 600 to instruct on the kill zone theory of attempted murder, (4) the trial court erroneously failed to give a unanimity instruction as to count 5, (5) the trial court erred as to counts 1, 2, 4, and 5 by giving CALCRIM No. 600, which used the phrase "zone of harm," and (6) the trial court erroneously admitted gang evidence.

*DISCUSSION*

1. *There Was Sufficient Evidence of Intent to Kill as to Counts 1, 2, 4, and 5, and the Trial Court Did Not Err by Using CALCRIM No. 600 to Instruct on the Kill Zone Theory.*

Appellant claims there is insufficient evidence of intent to kill supporting his convictions on counts 1 (Mahoney), 2 (James), 4 (Sir), and 5 (Jane Doe). Resolving the claim under familiar principles,[7] we reject it.

---

[7] " 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Stone* (2009) 46 Cal.4th 131, 136 (*Stone*).) " 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).) The "very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill." (*Id.* at p. 742.) Concerning the kill zone theory, *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*) " 'recognizes that a shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]' [Citation.]" (*People v. Perez* (2010) 50 Cal.4th 222, 232 (*Perez*).) "This concurrent intent theory . . . is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland*, *supra,* 28 Cal.4th at p. 331, fn. 6.)

There is no dispute as to the sufficiency of the evidence an attempt to murder William (count 3) occurred and William was the primary target. Appellant concedes there was substantial evidence of attempted murder as to counts 1, 2, 4, and 5, if, as to each said count, there was substantial evidence of attempted murder under the kill zone theory or substantial evidence the shooter specifically intended to kill each victim. As to counts 1, 2, 4, and 5, and the kill zone theory, there was substantial evidence as follows. Appellant, from 49 feet away,[8] sprayed five or six high-powered .45-caliber bullets from a semiautomatic handgun, using two hands to aim the gun (1) towards the table where Mahoney and Sir were sitting, and where Armi or Nayvi was located, and (2) towards the area from the table to the locations of William and James, inclusive.[9] (As discussed below, count 5 pertained to a child, either Armi or Nayvi, near Mahoney.) Fairly read, James's testimony was to the effect the distance between, on the one hand, the table and, on the other, the locations of William and James, was about six or seven feet. Mahoney testified to the effect it was probably two feet.

Appellant ran to the fence to catch William and the family by surprise and maximize the chances appellant would achieve his intents to kill. Appellant approached as close as he could to the wire fence, and thus to William and the family, to achieve

---

[8]      In *Perez,* the court observed, "a rational trier of fact could find that defendant's act of firing a *single* bullet at a group of eight persons from a distance of *60* feet established that he acted with intent to kill *someone* in the group he fired upon." (*Perez, supra*, at p. 230, first and second italics added.) In other words, the fact the distance was 60 feet did not prevent a finding of intent to kill. The facts in the instant case present a stronger case for intent to kill findings.

[9]      As to count 2 (James), there is no dispute the shooter attempted to murder William, and William was the primary target. James was near William when the shooting occurred. According to Mahoney, James was left of William, and if William had not fallen, he would have been shot in the head. According to James, appellant pointed the gun at *James* and William and was trying to shoot at both. When appellant fired the shots, James was near enough to William to push him down. Appellant himself suggests the sufficiency of the evidence as to count 2 when he discusses James's proximity to William and asserts "there is at most evidence to support two counts of attempted murder."

9

appellant's intents to kill without jumping the fence and increasing the risk he would be caught. Once the shooting started, family members were trying to enter a nearby bedroom door, reducing the distance between family members and effectively making it easier to shoot them. Mahoney found a bullet shell in front of the table, Furlong found a bullet or bullet fragment on the north side of the porch, and a bullet hole was discovered in the garage wall near the locations of William and James. We conclude there was sufficient evidence, under a kill zone theory, the shooter committed attempted murder as to counts 1, 2, 4, and 5. (Cf. *Ochoa, supra,* 6 Cal.4th at p. 1206.) None of appellant's arguments compel a contrary conclusion.[10]

Appellant presents the related claim the trial court erred by giving CALCRIM No. 600, because there was insufficient evidence supporting the kill zone theory as to counts 1, 2, 4, and 5. However, as previously discussed, there was sufficient evidence supporting the kill zone theory. No instructional error occurred. Moreover, as to each of

---

[10]    The fact all five or six bullets and/or bullet shells were not found does not compel a contrary conclusion. That "the victim or victims may have escaped death due to the shooter's poor marksmanship does not necessarily establish a less culpable state of mind." (*Smith*, *supra,* 37 Cal.4th at p. 745.) Milchovich found the two casings on the grass near the wire fence a day after the shooting, and did not testify access to that area had been restricted before he found the casings.

    Moreover, leaving aside the kill zone theory, we note the following. As to count 1 (Mahoney), she testified that after the shooting started and she brought Sir into the house, she came back outside, stood in the walkway of her yard, and appellant fired his fifth and last shot. Mahoney looked directly in appellant's face when he fired that shot. Given the rest of the facts in this case, we conclude there was sufficient evidence the shooter committed attempted murder of Mahoney (count 1), apart from the kill zone theory. Further, although the kill zone theory requires a primary target, attempted murder does not. "[A]ttempted murder does not necessarily require a specific target. We have held that an indiscriminate would-be killer who fires into a crowd is just as culpable as one who targets a specific victim. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1218 (*Houston*); see *Stone, supra*, 46 Cal.4th at p. 140.) Given the totality of the facts in this case, there was sufficient evidence of attempted murder as to counts 1 through 5 on the theory appellant committed attempted murder as an indiscriminate would-be killer (cf. *Houston*, at p. 1218), i.e., even if the kill zone theory did not apply.

counts 1 through 5, there was sufficient evidence appellant committed attempted murder as an indiscriminate would-be killer (see fn. 10, *ante*). The court's instructions and the prosecutor's argument permitted the jury to convict appellant on those counts independent of kill zone theory.[11] The jury not only convicted appellant of attempted murder but found the attempted murder was willful, deliberate, and premeditated. No prejudicial instructional error occurred. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

2. *There Was Sufficient Identification Evidence.*

Appellant claims there is insufficient evidence identifying him as the shooter. We disagree. Our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the judgment. (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1181-1182.) The People presented evidence at trial that, inter alia, during photographic lineups, James and William identified appellant as the shooter. At trial, Mahoney and James identified appellant as the shooter. At one point during trial, William, whom the jury reasonably could have concluded was unwilling to testify because he was a gang member and/or feared retaliation, tentatively identified appellant as the shooter.

Appellant attempted to dissuade Mahoney from testifying (count 7), tried to get William to change his version of what happened, and repeatedly fled from police, evidencing consciousness of guilt. Appellant and William were members of rival gangs, a fact providing appellant a motive to shoot him. There was sufficient evidence identifying appellant as the person who committed the attempted murders at issue in counts 1 through 5. (Cf. *Ochoa, supra,* 6 Cal.4th at p. 1206.)

---

[11] CALCRIM No. 600, given to the jury, permitted the jury to convict appellant on counts 1 through 5, on the theory (1) appellant intended to kill William and everyone within the "kill zone" or (2) appellant intended to kill the victim alleged in each count. The prosecutor argued the kill zone theory, and also argued the jury could "independently think that, well, [appellant's] firing a gun at five people, so apparently he's trying to kill five people."

3. *The Trial Court Did Not Err by Failing to Give a Unanimity Instruction as to Count 5.*

The information alleged as to counts 5 and 6 that appellant attempted to murder Armi ("Armi R.") and Nayvi ("Navy F."), respectively. On July 24, 2014, the court granted appellant's Penal Code section 995 motion to dismiss count 6 (with victim Nayvi). On August 5, 2014, prior to opening statements, the People moved to amend count 5 to change Armi to "Jane Doe." The court granted the motion. The court explained it previously had dismissed count 6 because, based on the preliminary hearing evidence, the child at issue in that count[12] was "12 feet away out of the photograph" and not in the kill zone; the court expected the People's jury argument to clarify the People were not seeking to convict appellant of attempted murder of that child (if the state of the trial and preliminary hearing evidence was the same); count 5 applied to the child who was close to Mahoney; and that child was either Armi or Nayvi.

The court stated, "I don't think [the amendment] changes anything. It's still the original five counts." The court observed the amendment changed only the name of the victim in light of the uncertainty, based on the preliminary hearing evidence, of whether the child who was close to Mahoney was Armi or Nayvi.

As previously mentioned, Mahoney testified to the effect *Armi* was near Mahoney. Mahoney also testified at one point that Nayvi was "way to the left," by the front door, not sitting where Mahoney was, and not observable on exhibit No. 1. James testified to the effect *Nayvi* was near Mahoney. James, using exhibit No. 17, also pointed to a location left of Mahoney and further left of the porch, and testified he could not really see Armi's location in the exhibit.

During opening jury argument, the prosecutor argued Jane Doe was alleged as the victim in count 5, and the victim in that count was the "child standing by the table where [Mahoney] was sitting," i.e., the child "right next to . . . [Mahoney]" in the "little porch area." The prosecutor also argued concerning count 5, "[Mahoney] says it was Armi and

---

[12] The court's comment suggests the court did not remember who, as between Armi and Nayvi, had been the victim alleged in count 6.

James says it was Nayvi. As long as you decide there was a human being standing next to that table, defendant is guilty of attempted murder of that person, could be Nayvi, could be Armi. That's up to you."

Appellant claims the trial court erroneously failed to give a unanimity instruction as to count 5. We disagree. Count 5 alleged Jane Doe as the victim[13] and it is clear from the record Jane Doe ultimately stood only for Armi or Nayvi. Mahoney and James testified that, as between Armi and Nayvi, one child was, and the other child was not, near Mahoney, although the two witnesses differed concerning which of the two children was the one near Mahoney. We assume the testimony of Mahoney and James established multiple acts, either one of which could constitute attempted murder.

However, a conviction for attempted murder required that appellant attempt to kill an intended victim. (*Bland*, *supra,* 28 Cal.4th at p. 328) The prosecutor's argument to the jury that, as to count 5, appellant was guilty of the attempted murder of *the child standing near Mahoney and the table where she was sitting* constituted a prosecutorial election of offenses that satisfied the unanimity requirement even absent an instruction. (See *People v. Jennings* (2010) 50 Cal.4th 616, 679; *People v. Mayer* (2003) 108 Cal.App.4th 403, 418.) No error occurred.

4. *The Trial Court Did Not Err by Giving CALCRIM No. 600.*

The court, using CALCRIM No. 600, instructed on attempted murder, including the elements the defendant took a direct step towards killing another person and "[t]he defendant intended to kill that person." CALCRIM No. 600 also instructed on the kill zone theory. Appellant claims the trial court erred by giving CALCRIM No. 600. He argues the trial erred because, according to appellant, the instruction refers to a "zone of harm *rather than* a zone of lethal harm." (Italics added.) In fact, however, the instruction

---

[13] An accusatory pleading may allege a defendant committed the attempted murder of "John Doe" (*People v. McGlothen* (1987) 190 Cal.App.3d 1005, 1014; see *Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 843) and a defendant may be convicted of the attempted murder of "John Doe." (See *People v. Nelson* (2011) 51 Cal.4th 198, 203, 206.)

referred to "a particular zone of harm *or* 'kill zone' " (italics added), a formulation suggesting the two phrases are equivalent.

In any event, in *People v. Bragg* (2008) 161 Cal.App.4th 1385, the trial court gave CALCRIM No. 600, and language from *Bland*, as instructions on the kill zone theory. (*Bragg*, *supra*, at pp. 1394-1395.) The instructions used the phrase "zone of *harm*" (*ibid*., italics added) and *Bragg* addressed the issue of the adequacy of that phrase to express the idea of a *kill* zone. *Bragg* stated, "[n]o reasonable juror could have failed to understand from the instructions as a whole that, to the extent the court occasionally used . . . the phrase 'zone of harm,' the harm to which the court referred was the ultimate harm of death and that the law required that defendant had to have intended to kill the victims. Given the totality of the instructions, there was no error." (*Id.* at p. 1396.) Similar reasoning applies here in light of the entire language of CALCRIM No. 600 given to the jury. No instructional error occurred. Moreover, our analysis in part 1 of our Discussion that there was no prejudice from any instructional error equally applies here.

5. *The Gang Affiliation Evidence Was Admissible.*

Appellant claims the trial court erroneously admitted gang affiliation evidence, i.e., 11 taped jail calls, testimony from gang experts, and information from field identification cards. We reject the claim. Appellant summarily refers to the evidence without expressly and specifically identifying the participants in each call, or the allegedly objectionable content of the calls, expert testimony, or cards. The burden is on appellant to demonstrate error from the record; error will not be presumed. (*In re Kathy P.* (1979) 25 Cal.3d 91, 102; *People v. Garcia* (1987) 195 Cal.App.3d 191, 198.) An appellate court is not required to search the record to ascertain whether it contains support for appellant's claim. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545.) Moreover, the evidence was relevant to, inter alia, appellant's motive and intent, as well as to the issue of identity and the gang enhancement allegation. (Cf. *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 (*Funes*); see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050.)

14

Assuming appellant raised Evidence Code section 352 objections, the trial court did not abuse its discretion to the extent the court overruled them. (Cf. *Funes, supra,* 23 Cal.App.4th at pp. 1518-1519.) Moreover, the application of the ordinary rules of evidence, as here, did not impermissibly infringe on appellant's rights to due process and to present a defense. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) No error occurred.

### *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

EDMON, P. J.

ALDRICH, J.

15