Filed 11/30/23  P. v. Brown CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079830 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No.  SCD193788) |
| DARRELL ANGELO BROWN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Justin Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley, and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

In 2007, a jury convicted Darrell Angelo Brown of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and being an accessory after the fact (§ 32; count 3). The jury also found Brown committed the murder in furtherance of a criminal street gang (§ 186.22, subd. (b)(1)) and was a principal in the murder. In addition, the jury found true that, in the commission of the offense, at least one principal personally used a firearm and proximately caused great bodily injury and death to a person (§ 12022.53, subds. (d)). Brown subsequently admitted to having two prison prior convictions (§§ 667.5, subd. (b), 668), a serious felony prior conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and a prior strike conviction (§§ 667, subds. (b)-(i), 668, 1170.12). The court sentenced Brown to prison for 50 years to life plus a term of seven years.

On April 5, 2019, Brown filed a petition for resentencing under section 1172.6.[2] The court held an evidentiary hearing. The court found Brown ineligible for relief because the evidence showed he was guilty of murder beyond a reasonable doubt.

Brown appeals, contending (1) the trial court applied the wrong legal standard in determining the prosecution met its burden; (2) substantial evidence does not support the court's finding of guilt; and (3) in the alternative, his conviction should have been reduced to second degree murder. We disagree with these contentions and affirm the order.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] Senate Bill No. 1437 enacted section 1170.95, which was renumbered section 1172.6 without substantive change in the text. (Stats. 2022, ch. 58, § 10 [effective June 30, 2022].) We will refer to this statutory provision as section 1172.6 for the purposes of this opinion.

FACTUAL AND PROCEDURAL BACKGROUND[3]

In the trial court's written order denying Brown's petition for resentencing under section 1172.6, it focused on the following facts:

Brown and the shooter, Rico F., were part of the Bloods criminal street gang, ESP. Rico was 15 years old, and Brown was 26 years old. Rico lived near 17-year-old Darnell M., and Brown lived across the street from Darnell.

The night of the shooting, Brown took Rico and Darnell around town. They went to an event for three hours in El Cajon, then to downtown to check out the scene, and then traveled to the border area to see if they could meet any women returning from clubs in Tijuana. Brown, Rico, and Darnell hung out in a fast food restaurant parking lot. Darnell became tired and fell asleep in the car. Brown and Rico went inside the restaurant to purchase food. When they failed to meet any women, Brown drove Rico and a sleeping Darnell to the Bay Vista apartment complex, which was known to be LPB[4] territory. The complex was a known LPB " 'stronghold.' "

Rico exited Brown's car at the apartment complex and walked up to a car in the parking lot. The vehicle was occupied by two LPB gang members and three women. Rico was having issues with one of the gang members. Rico then shot into the vehicle, killing one of the women.

Because Rico was a juvenile and too young for a driver's license, Brown drove him to the apartment complex to commit the shooting. Brown waited and then drove Rico away from the complex after the killing.

---

[3]    We primarily repeat the salient facts as described by the trial court in its ruling on Brown's section 1172.6 petition. We note that Brown includes many of these same facts in his opening brief.

[4]    LPB is criminal street gang.

After the shooting, Brown was involved in the purchase of a bus ticket for Rico to allow him to leave town. He had his girlfriend drive Rico to the bus station, and he gave Rico some money for the bus trip. Rico's bus ticket was purchased by another ESP gang member in Brown's name.

In addition to the facts surrounding the shooting, the trial court emphasized certain evidence concerning criminal street gangs. To this end, the court noted the following:

There are more Bloods than Crips in San Diego, and there are internal rivalries between some of the Blood sets. LPB and ESP are both Blood sets, are rivals, and do not get along. These two criminal street gangs are the largest Blood sets in San Diego, and their rivalry, which has existed for several years, is deadly.

The structure of the ESP gang is loose. An older gang member is referred to as "Original Gangster" or "OG." A 15 to 18-year-old kid could refer to a 28 to 30 year-old member as an OG because the older member has been around, put in a lot of work for the gang, and is very well known within the gang. A 15-year old member would look at a gang member in his 20s as an OG. OGs can take members under their wings and "show them the ropes."

Younger ESP members usually start to "put in work for the gang between 14 to 18 years of age." They obtain respect by committing violent crimes and being street thugs. Usually by their 20s they have put in enough work to be an established member. A Rider is someone who develops himself into someone willing to go out and do a violent act for the gang. A Rider could be as young as 14 and be hardcore for the gang. Violence against a rival gang member would increase their reputation and the gang's reputation.

4

A photograph was entered into evidence at trial of Rico holding up the "fuck LPB hand sign." Also, Brown had tattoos disrespecting LPB. And the gun Rico used in the shooting had been used by a person claiming to be a member of the ESP gang during a drive by shooting on December 23, 2005.

Brown was an older and established ESP member who took Rico and Darnell out on the night in question. Both Brown and Rico knew that their gang was a rival of LPB and their interaction with each other was the deadliest of all gang rivalries in San Diego.

The trial court found, "after considering the admissible evidence, argument of counsel and sitting as an independent factfinder," the prosecution met its burden and established beyond a reasonable doubt that Brown was guilty of murder and is ineligible for resentencing. As such, the court found: (1) Rico's act of shooting into a vehicle was a life endangering act; (2) Brown aided in the commission of the shooting by driving Rico to the apartment complex where the shooting took place, driving him away from the apartment complex, and helping Rico buy a bus ticket to leave the area; (3) Brown knew shooting a gun is dangerous to human life and acted in conscious disregard for human life by driving Rico to the apartment complex to shoot at a rival gang member; and (4) Brown had knowledge that Rico was going to shoot someone at the Bay Vista apartment complex and intended to aid Rico in that endeavor.

The court therefore denied Brown's petition under section 1172.6.

Brown timely appealed.

## DISCUSSION

Brown claims the trial court applied the wrong legal standard in determining the prosecution met its burden and that substantial evidence does not support the court's finding of guilt. In the alternative, if we

determine that the trial court did not err in finding Brown was not entitled to relief under section 1172.6, Brown argues his conviction should be reduced to second degree murder.

A. Legal Principles

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was enacted to " 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) Senate Bill 1437 did this by amending section 188, which defines malice, and section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, §§ 2 & 3.) Amended section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Amended section 189 states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] [or] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Senate Bill 1437 also established resentencing relief for eligible defendants. (§ 1172.6, subd. (a); *People v. Strong* (2022) 13 Cal.5th 698, 707–708.) Under section 1172.6, subdivision (a), "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition" with the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts "when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" under Senate Bill 1437. After receiving a petition containing the required information, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Strong*, at p. 708, citing § 1172.6, subd. (c).) If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c), (d)(3).)

Effective January 1, 2022, Senate Bill No. 775 (2020-2021 Reg. Sess.) (Senate Bill 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California law as amended by Senate Bill 1437 and (2) "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt,

7

that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see Stats. 2021, ch. 551, § 1, subd. (c).) Senate Bill 775 clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill 1437. (*People v. Clements* (2022) 75 Cal.App.5th 276, 294, 297 (*Clements*).)

B. The Legal Standard Applied by the Trial Court

At an evidentiary hearing under section 1172.6, the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to section 188 or 189 made effective January 1, 2019. (§ 1172.6, subd. (d)(3).) Thus, as discussed *ante*, it is the province of the trial court to act as an independent fact finder to determine whether the prosecution carried its burden. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984; accord *Clements*, *supra*, 75 Cal.App.5th at pp. 294, 297.)

Here, Brown asserts that the trial court utilized an improper standard in determining whether the prosecution met its burden. However, he acknowledges that, in its order denying relief, the trial court explicitly noted the correct standard: "[T]his court will act as an independent factfinder and determine whether the People satisfied their burden of proving beyond a reasonable doubt that [Brown] is guilty of murder based on the evidence contained in the record of conviction and any additional evidence presented at the hearing." Yet, Brown essentially urges us to disregard this and other similar statements made by the trial court and instead center on the instances in the order where the court stated " 'sufficient evidence' " supported certain findings. We do not share Brown's selective reading of the trial court's order.

8

In the instant action, the trial court specifically stated its role at the evidentiary hearing was to sit as an independent factfinder and determine whether the prosecution carried its burden of proving Brown guilty of murder beyond a reasonable doubt. After discussing various legal issues, the trial court reiterated the correct standard when it began to explain its ruling: "[T]he court finds the People have proven beyond a reasonable doubt that [Brown] is ineligible for resentencing." And the court again repeated the correct standard at the end of its order: "Accordingly, the court finds, after considering the admissible evidence, argument of counsel and sitting as an independent factfinder, the People have met their burden of proof and established beyond a reasonable doubt that [Brown] is guilty of murder and is ineligible for resentencing."

Nonetheless, Brown asks us to largely ignore the trial court's explicit references to the beyond a reasonable doubt standard it applied and focus on the times in the order where the court mentioned "sufficient evidence." Based on these comments, Brown argues the superior court was applying an inappropriate substantial evidence standard to its review of the evidence. Not so.

Although the court did mention sufficient evidence, it did so within the context of finding that the prosecution carried its burden of proving Brown guilty of murder beyond a reasonable doubt. In this sense, the court was merely stating that it found sufficient evidence to reach certain findings to support its conclusion that the prosecution satisfied its burden. Indeed, the court specifically explained as much: "This court needs to find there is sufficient admissible evidence to support a finding beyond a reasonable doubt that [Brown] had knowledge that [Rico] intended to shoot someone and he intended to aid [Rico] in the commission of the shooting." Accordingly, the

9

court's reference to "sufficient evidence" was not indicative that it was applying a substantial evidence standard to the prosecution's case or otherwise decreasing the prosecution's burden of proof. Rather, "sufficient evidence" was merely a way in which the court referred to how the court weighed the evidence presented at the hearing.

"The very settled rule of appellate review is a trial court's order/judgment is presumed to be correct, error is never presumed, and the appealing party must affirmatively demonstrate error on the face of the record." (*People v. Davis* (1996) 50 Cal.App.4th 168, 172.) "Absent an indication to the contrary, we are required to presume a court was aware of, and followed, the applicable law and considered all the relevant facts and arguments." (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 447.) On the record before us, Brown has not demonstrated that the trial court applied the wrong standard in concluding the prosecution satisfied its burden of proof.

C. Substantial Evidence

Next, Brown contends the trial court's determination that he was guilty of murder is not supported by substantial evidence. In a substantial evidence review, we " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a *reasonable trier of fact* could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277 (*Ghobrial*).) We " ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*People v. Clark* (2011) 52 Cal.4th 856, 943.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*Ibid*.) " ' " ' " ' " 'If the circumstances reasonably justify the trier of fact's findings,

the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' " (*Ghobrial*, at p. 278.)

At the evidentiary hearing below, the trial court found "there [was] sufficient evidence to establish beyond a reasonable doubt that [Brown] aided and abetted in the second-degree murder committed by Rico . . . ." Therefore, the court found that Brown acted with implied malice and aided and abetted Rico.

Aider and abettor liability is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*), quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Alternatively stated, " '[a]n aider and abettor must do something *and* have a certain mental state.' " (*Powell*, at p. 712.) "For the direct aider and abettor, the [act] includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Id.* at p. 713.)

Here, Brown does not challenge the trial court's finding that Brown committed an act or acts aiding and abetting Rico. Rather, Brown focuses on the required mental state of aiding and abetting implied malice murder. To this end, he contends "the court's findings regarding [his] intent were not supported by substantial evidence and require reversal."

Implied malice exists if "someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 844, citing § 188, subd. (a)(2).) " 'In short, implied malice requires a

11

defendant's awareness of engaging in conduct that endangers the life of another . . . .' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Further, "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 714.)

Here, there was substantial evidence Brown knew Rico was going to the apartment complex on the subject evening to shoot at a rival gang member and intended to assist Rico in the shooting. Brown and Rico were both members of the ESP criminal street gang. ESP's chief rival gang was LBP, a relationship reflected by Brown's tattoo. He knew the Bay Vista Apartment complex was an LBP stronghold, where LBP gang members lived and spent their time. Additionally, based on Brown's history with ESP, he knew that if an ESP gang member went to LBP territory violence would very likely ensue.

With this in mind, Brown drove Rico to the apartment complex. The trial court reasonably found that Brown appreciated the danger to Rico and would not allow him to enter rival territory alone and unarmed. As such, the trial court inferred that Brown was aware Rico was armed. In addition, the firearm Rico used had been previously used in at least one other gang related shooting by an ESP member. Therefore, we find substantial evidence supports the trial court's inference that Brown knew Rico was armed with a firearm, and the primary purpose of taking Rico to Bay Vista Apartments was for Rico to shoot a rival gang member.

Also, the trial court found it significant that, at the time of the shooting, Brown was 26 years old, and Rico was 15 years old. Gang expert testimony explained that the structure of the ESP gang was for the higher ranking gang members, OGs, to mentor younger gang members and oversee their commission of crimes. Although we agree with Brown that there was no evidence conclusively establishing that he was mentoring or overseeing Rico as part of his ESP gang duties, it nonetheless seems logical that Brown would only take a young gang member into rival gang territory at 4:00 a.m. for a purpose that was dangerous to human life (namely, to attack rival gang members). There was no other plausible theory offered that explained why Brown would drive Rico to a rival gang stronghold and allow Rico to exit the car and approach a car full of LBP gang members. By knowingly encouraging and furthering Rico's actions of going into a rival gang's territory armed with a gun, Brown acted with conscious disregard for human life.

Nevertheless, Brown contends that even assuming a specific gang structure, applying that structure to the facts at hand, specifically that Brown was an OG and he was mentoring Rico, was pure speculation. We disagree. Although perhaps not the strongest evidence, "[c]ases have repeatedly held that it is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent. [Citations.]" (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518; *People v. Sanchez* (2016) 63 Cal.4th 665, 698 [An expert properly may relate "background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory," which is "relevant and admissible evidence as to the . . . gang's history and general operations."].) "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]" (*People v. Samaniego*

(2009) 172 Cal.App.4th 1148, 1167–1168; see *People v. Valdez* (2012) 55 Cal.4th 82, 130–131 [gang rivalry motive].) Here, the gang evidence provided the necessary context to explain why a 26 year old man (Brown) would drive a 15 year old boy (Rico) to an apartment complex known to be a stronghold of a rival gang at 4:00 in the morning. And why he then would allow Rico to leave the car and approach a car full of rival gang members. Moreover, the gang evidence belies Brown's suggestion that he was not aware of what Rico was going to do at the apartment complex.

Also, our conclusion is not altered by the fact that Darnell did not hear any discussion about the shooting on the night in question when he was hanging out with Brown and Rico. That Darnell did not hear any discussion, does not mean it did not happen. Nor was such testimony necessary to prove intent. In addition, it is a reasonable inference that Brown and Rico would not discuss gang business in the presence of Darnell, who was a neighbor and friend, but not an ESP gang member. Also, Darnell was sleeping part of the time he was with Brown and Rico, and he was not present when Brown and Rico went into the fast food restaurant.

In light of the evidence discussed above, we conclude that substantial evidence supports the trial court's finding that Brown's acts and mental state reflect that he was an aider and abettor whose conduct demonstrated an abandoned and malignant heart.

D. Reduction to Second Degree Murder

Brown's final argument is that his conviction should be reduced to second degree murder, and he should be resentenced accordingly. In making this argument, however, he acknowledges that at least one California court has held that section 1172.6 does not allow a trial court to reduce a first degree murder conviction to second degree murder. (See *People v. Gonzalez*

(2023) 87 Cal.App.5th 869, 881.)  Yet, Brown argues that *Gonzalez* was wrongly decided.

After Brown filed his opening brief, but before he filed his reply brief, this court issued an opinion following *Gonzalez*.  (See *People v. Didyavong* (2023) 90 Cal.App.5th 85, 96–99.)  Brown has not offered any arguments that we did not consider in deciding *Didyavong* or that cause us to reconsider our reasoning in that case.[5]  As such, we reject Brown's final argument for the reasons set forth in *Didyavong*.  (See *id.* at pp. 96–99.)

## DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.

---

[5]     In his reply brief, Brown noted our opinion in *People v. Didyavong*, *supra*, 90 Cal.App.5th 85,  but he did not offer any new arguments against that opinion.  Rather, he "continue[d] to rely on the arguments regarding this issue in the opening brief so as to preserve his right to file a petition for review in the California Supreme Court, which has not yet resolved this issue."